Otha J. MILLER et al. Richard Nissley
et al., Appellants

v.

Elmer B. STAATS, Comptroller of the
United States, et al.

No. 82–1637.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 28, 1983.

Decided April 29, 1983.

Kathleen Pontone, Richard T. Sampson, Semmes, Bowen & Semmes, Baltimore, Md., was on brief, for appellants.

Gerald M. Goldstein, Sp. Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and Royce C. Lamberth, R. Craig Lawrence, and Ann S. DuRoss, Asst. U.S. Attys., Washington, D.C., were on brief, for appellees.

Before WRIGHT, WILKEY and WALD, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Appellants, plaintiff-intervenors in the District Court, represent a class of white male employees who negotiated a consent decree with appellees, the General Accounting Office (GAO) and the General Services Administration (GSA), regarding certain alleged reverse discrimination actions.[1] After the District Court approved their consent decree, appellants learned that appellees proposed to enter into a potentially conflicting agreement with a group of minority and female employees. They successfully intervened in that litigation and succeeded in having changes made to the proposed decree. Appellants then filed a petition under Section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k) (1976), for attorney fees incurred in the intervening litigation. The District Court denied the petition because appellants were not "prevailing parties" within the meaning of the statute. We find that the District Court applied an improper standard in determining appellants' "prevailing parties" status. Therefore, we vacate its decision and remand for further proceedings on the attorney fees petition.

## I. BACKGROUND

This attorney fees petition arose out of an alleged conflict between two independent Title VII discrimination suits. The first suit began in May of 1973 when a class representing black and female employees—the *Miller* class[2]—initiated legal action alleging that appellees had discriminated by using racial and sexual criteria in their employment actions. Because plaintiffs' earlier administrative complaints were resolved against them,[3] the District Court rejected plaintiffs' preliminary motions for class certification and summary judgment, thereby forcing the action into hibernation. In 1977, however, an intervening Supreme Court decision[4] prompted the District Court to reverse itself and stirred the class to resume its action. On proper motion, the court ordered discovery to commence and officially certified the plaintiff class.[5]

Meanwhile, in March of 1978 another class of GAO/GSA employees, representing white males (the *Smith* class), filed suit, alleging reverse discrimination in employment. *See Smith et al. v. Staats,* Civil Action No. 78–0098 (D.D.C.1979). After numerous hearings concerning the alleged

1. In 1976, certain GAO functions pertinent to this case were transferred to GSA. At that point GSA became a named defendant along with GAO in this action.

2. The named plaintiff and class representative in this litigation is Otha J. Miller.

3. The *Miller* plaintiffs originally filed an administrative complaint against GAO on April 28, 1970. Two further administrative complaints were filed on January 25, 1972 and August 24, 1972. These administrative complaints were, however, resolved against the *Miller* class.

4. In 1976, in *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), the Supreme Court held that federal employees have a right to trial *de novo* after exhausting their administrative remedies.

5. The class was defined as all past, present, and future racial minority and female employees in the pertinent divisions of GAO and GSA. Brief for appellees at 3.

reverse discriminatory policies and practices were held,[6] the parties agreed to settle their dispute.[7] They proposed a broad consent judgment in which appellees would agree not to discriminate on the basis of race,[8] would assure that any affirmative action programs did not adversely impact the promotional opportunities of white males,[9] and would apply their personnel policies openly and evenhandedly in the future.[10] The District Court approved this settlement in March 1979. App. 364.

The concurrent *Miller* litigation was rapidly moving forward.[11] In December 1980, however, after exhaustive discussions, the parties finally agreed to enter into a consent decree of their own. This decree provided, in pertinent part, that GAO would establish a settlement fund in lieu of all monetary claims,[12] would develop and im-

plement job-related performance standards,[13] would establish certain promotional goals for minority and female employees,[14] would develop and implement training programs,[15] and would allow plaintiffs to monitor GAO's compliance with the decree through stipulated reporting mechanisms.[16] On December 19, 1980 the District Court preliminarily approved the consent judgment.

As provided in the decree, the *Miller* settlement was circulated among appellees' employees to give them an opportunity to object to any part of the agreement. App. 366. When they received the proposed decree, various members of the white male class became concerned. Their counsel alerted appellees that the proposed *Miller* decree might be in conflict with the *Smith* decree,[17] but these warnings apparently fell

---

6. These hearings considered, *inter alia,* whether GAO policies on recruitment, job classification, hiring, assignment, promotion, and discipline were being applied to non-whites in a preferential manner. *See* brief of plaintiff-intervenors at 3–4.

7. Appendix (App.) 357.

8. In the decree, GAO promised:

    The GAO, its officials, managers, employees, and agents specifically agree to be bound by the provisions of this Decree which is inten[d]ed to insure that no GAO policies or practices discriminate against any past, present, or future employee or applicant for employment on the basis of race. GAO agrees to use its good faith efforts to implement fully and comply with the provisions set forth in this Decree.

    *Smith* Consent Decree at 3, ¶ IV, App. 361.

9. Thus GAO promised:

    GAO agrees that the implementation of the GAO Affirmative Action Program will have no adverse impact on the promotional opportunities of the Plaintiff or on any member of the alleged class on the basis of their race, white. GAO further agrees that the implementation of any Affirmative Action Program will have no adverse impact upon the duties and responsibilities of, nor upon the terms and conditions of employment of, Plaintiff or members of the alleged class who are supervisors.

    *Smith* Consent Decree at 4, ¶ VII, App. 362.

10. *Id.*

11. In April 1980 plaintiffs filed a motion for partial summary judgment with the court. The

parties filed oppositions and responses in the subsequent months, and then submitted pretrial briefs in June and July of 1980. On August 27, 1980 the court denied plaintiffs' motion for partial summary judgment and scheduled a trial to commence on October 6, 1980.

12. Proposed *Miller* Consent Decree, ¶ 9, App. 375.

13. *Id.,* ¶ 19, App. 382–383.

14. *Id.,* ¶ 21, App. 384–386.

15. *Id.,* ¶ 23, App. 386–389.

16. *Id.,* ¶ 6, App. 372–374.

17. The *Smith* class was primarily concerned that the Affirmative Action Program described in ¶ 21 of the *Miller* decree was in conflict with ¶ 7 of their decree. Paragraph 21 of the *Miller* decree set certain "minimum goals" for promotions and for filling vacancies at GAO.

    [D]uring the pendency of this Consent Decree and consistent with the agencies' policy generally to promote from within, the parties adopt the following minimum goals for promotions and otherwise filling vacancies:

    \* \* \* \* \* \*

    If the goals set forth herein are not being met, the defendants shall include with the statistical data a detailed written justification as to why those goals are not being met, and the steps which the defendants intend to take to meet the goals in the subsequent time period as well as cumulatively. \* \* \*

    App. 384–386.

on deaf ears and went unheeded.[18] Worried that the District Court would approve conflicting settlements, *Smith* counsel next sought to intervene [19] in the *Miller* litigation.[20] Both the *Miller* class plaintiffs and appellees vigorously resisted this intervention.[21]

On July 14, 1981 the District Court allowed the *Smith* class [22] to intervene in the *Miller* litigation. It further ordered the parties to meet and to "attempt to resolve their differences over paragraph 21 of the Proposed Consent Decree * * *." App. 161. The parties did meet, but could not obtain a mutually satisfactory resolution. On August 6, 1981 the District Court further admonished the parties to settle their differences and, as a result, agreement was finally reached. App. 146.

On August 10, 1981 the District Court approved a final Consent Decree in the *Miller* litigation. This final order included all of the changes that the *Smith* plaintiffs, the *Miller* plaintiffs, and appellees had agreed upon on August 6. For example, the "minimum" *qua* "minimum" promotional goals and the requirement that appellees justify their failure to meet such goals were deleted from Paragraph 21.[23] Moreover, the *Smith* plaintiffs were accorded substantial rights to receive reports and continue monitoring the decree.[24] With these and other demands met,[25] the *Smith* class offered no more objections to the entrance of the *Miller* decree.

Appellants subsequently filed their petition for attorney fees and costs, asking $26,023.75 for legal services and $2,449.24 for costs. App. 84. Appellees opposed the petition on the ground that appellants were not "prevailing parties" within the meaning of Title VII's attorney fees provision. App. 77.

On May 27, 1982 the District Court denied appellants' petition for attorney fees. The court noted that appellants, as full parties to the action, "did, in some sense, prevail in the underlying case by virtue of the fact that they succeeded in having the affirmative action provisions of that consent decree modified * * *." App. 3. Nonetheless, it found that appellants were not "prevailing parties" within the meaning of the statute:

First, there is no way of establishing that the proposed affirmative action provisions were originated by any actions of this defendant; on the contrary, it seems quite likely that such provisions were requested by the original plaintiffs during the settlement discussions. Since the proposed decree was negotiated among and entered into by *all* of the original parties, why should this particular defendant be required to assume the costs of the plaintiff-intervenors' efforts to modify the decree.

Second, even if defendant GAO could be charged with some degree of responsi-

---

The *Smith* class' other concerns related to their ability to review and comment upon GAO policies and reports. App. 300–301.

**18.** Counsel filed an informal complaint with GAO's General Counsel, but he apparently did not respond. App. 363. Moreover, GAO denied appellants' formal administrative complaints and simply referred appellants to the next step of the administrative procedure. App. 243–245.

**19.** Counsel made clear to the District Court that intervenors had two main objectives: Modification of the promotional goals and opportunity for review and comment on GAO policies and reports. App. 300–301.

**20.** At the same time, the *Smith* class filed a Motion for Rule to Show Cause for Contempt and Motion for Preliminary Injunction in *Smith*. Hearings on this motion were post-

poned until the *Miller* court had made its decisions concerning the alleged conflict.

**21.** They contended that the only way for the *Smith* class to object to the *Miller* decree was through the administrative procedure set out in the *Smith* decree. App. 326.

**22.** During the period that the *Smith* case was pending, the named plaintiff retired. Another member of that class, Richard Nissley, coordinated the case and became the named plaintiff-intervenor here.

**23.** App. 133–134.

**24.** App. 124.

**25.** For a list of the other changes, *see* brief of plaintiff-intervenor-appellants at 11 n. 10.

bility as a result of its originally consenting to the proposed affirmative action provisions, there has been no determination made that these provisions would in fact have resulted in legally cognizable and actionable discrimination against those represented by plaintiff-intervenors. Instead, all the court has before it are the facts that the plaintiff-intervenors believed the provisions would result in discrimination against their clients and that the original negotiators of these provisions agreed to modify them after discussions with the plaintiff-intervenors; these facts appear insufficient to support a threshold finding by this court that the provisions in issue did, in fact, propose and/or authorize actual discrimination against white males at GAO. * * *

App. 5–6 (emphasis in original). Thus, even though "plaintiff-intervenors may well have performed valuable services to both their clients and * * * the public by intervening in this proceeding," App. 6, the District Court would not award attorney fees because appellants had not "proven the defendant guilty, to some degree, of discrimination * * *." App. 4.

Plaintiff-intervenors filed this petition for review on June 7, 1982. We now vacate the District Court's judgment and remand for further proceedings consistent with this opinion.

## II. ANALYSIS

Under Title VII the District Court must award attorney fees to the prevailing party in civil rights litigation unless special circumstances would render such an award unjust. *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980); *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *see also Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (same under Title II). It is well recognized that the attorney fees provisions are to be liberally applied because the private "plaintiff is the chosen instrument of Congress to vindicate a 'policy that Congress considered of the highest priority.'" *Christiansburg Garment Co. v. EEOC, supra,* 434 U.S. at 418, 98 S.Ct. at 698 (*quoting Newman v. Piggie Park Enterprises, Inc., supra,* 390 U.S. at 402, 88 S.Ct. at 966).[26] District Courts, therefore, have only narrow discretion to deny fee awards[27] and must find that parties have "prevailed" whenever their actions have arguably advanced the purposes of Title VII.[28] "The statutory reference to the court's 'discretion' does not authorize a refusal to award any fees to a prevailing plaintiff unless special circumstances would render such an award unjust." *Kulkarni v. Alexander,* 662 F.2d 758, 766 n. 18 (D.C.Cir.1978).

The keynote case in this circuit, one which most appropriately places the term "prevailing party" within this scheme, is *Comm'rs Court of Medina County, Texas v. United States,* 683 F.2d 435 (D.C.Cir.1982). In *Medina* the court endorsed granting at-

**26.** Congress' purpose behind the attorney fees award provision was to make it easier for plaintiffs of limited means to bring meritorious suits, *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 420, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978). Fee awards are especially important when a federal agency or official is the defendant because private suits are the only manner in which federal employees can vindicate Title VII rights. *Parker v. Califano,* 561 F.2d 320, 331 (D.C.Cir.1977); *see generally Copeland v. Marshall,* 641 F.2d 880, 895 (D.C. Cir.1980) (*en banc*).

For discussions of the theories behind fee awards, *see generally* Rowe, *The Legal Theory of Attorney Fee Shifting: A Critical Overview,* 1982 DUKE L.J. 651; Nussbaum, *Attorney's Fees in Public Interest Litigation,* 48 N.Y.U.L. REV. 301 (1973); Note, *Pro Se Can You Sue? Attorney Fees for Pro Se Litigants,* 34 STAN.L. REV. 659 (1982).

**27.** *See New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) (plaintiffs entitled to fees expended in state administrative proceedings even though attorney was arguably not necessary).

**28.** *See Kulkarni v. Alexander,* 662 F.2d 758 (D.C.Cir.1978); Note, *Attorney's Fees in the Federal Courts,* 56 ST. JOHNS L.REV. 277, 286–296 (1982).

torney fees to defendant-intervenors whose case had become moot under the Voting Rights Act of 1965.[29] *Medina* outlined a liberal, two-pronged test for determining fee claimants' "prevailing party" status. In the first prong the court must determine that the fee claimant has substantially received the relief sought. *Id.* at 440. Fee claimants can satisfy this inquiry by showing that the "final result represents, in a real sense, a disposition that furthers" their interests. *Id.* at 441.[30] In the second prong the court must determine that "the *lawsuit* was a catalyst motivating defendants to provide" the requested relief, *id.* at 442 (emphasis in original), or that the "lawsuit was a necessary factor in obtaining the relief." *Id.* To satisfy this second prong fee claimants must demonstrate that their claims were "not wholly insubstantial"[31] and that these claims contributed to their obtaining the resulting relief.[32] Having satisfied these two prongs, fee claimants are entitled to attorney fees unless the court finds special circumstances that would render the award unjust. *Id.*

In this case the District Court determined that appellants were not "prevailing parties," and thus were not entitled to attorney fees. Though it clearly found that appellants had achieved their objective[33] and were the cause of the results obtained,[34] it

**29.** 42 U.S.C. § 1973 et seq. (1976). The *Medina* court specifically noted that the standards for awarding attorney fees under Title VII and the Voting Rights Act are the same. *Comm'rs Court of Medina County, Texas v. United States,* 683 F.2d 435, 440 n. 6 (D.C.Cir.1982).

**30.** The court thus noted that the proper inquiry must initially focus on the precise factual/legal condition that the fee claimant has sought to change, and then determine if the outcome, compared to this original condition, confers an actual benefit or relief from a burden. *Comm'rs Court of Medina County, Texas v. United States, supra* note 29, 683 F.2d at 441. *See also Bonnes v. Long,* 599 F.2d 1316 (4th Cir.1979). *Medina* specifically rejects the notion that fee claimants must show "that they have prevailed on every aspect of the case or that their proposed plan was adopted in order to be found 'prevailing parties.'" 683 F.2d at 441. Rather, the only question at this point in the inquiry is whether fee claimants have received any benefit at all.

**31.** This "substantiality" standard is set out in the legislative history of a related attorney fees statute, the Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. No. 94–559, 90 STAT. 2641 (1976), *codified at* 42 U.S.C. § 1988 (1976), *see* H.R.Rep. No. 94–1558, 94th Cong., 2d Sess. 4 n. 7 (1976) (in instances where courts reluctant to resolve merits of claim; fees may be awarded if the underlying claim meets the "substantiality" test of *Hagans v. Lavine,* 415 U.S. 528, 536–543, 94 S.Ct. 1372, 1378–1382, 39 L.Ed.2d 577 (1974)). This standard, then, duplicates the threshold test for federal subject matter jurisdiction, *see Hagans v. Lavine, supra,* and ensures that the alleged discrimination claims have at least colorable merit when analyzed in light of established Title VII theory. The standard requires courts to dismiss fee claims based on wholly frivolous lawsuits, but simultaneously constrains them from holding a full trial, or from making *ad hoc* predictions about plaintiff's chance for success, on the merits. The court may only consider whether claimant's action is "frivolous, unreasonable, or groundless." *Nadeau v. Helgemoe,* 581 F.2d 275, 281 (1st Cir.1978); *accord, Johnston v. Jago,* 691 F.2d 283 (6th Cir.1982); *Harrington v. DeVito,* 656 F.2d 264 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982). The substantiality of the claims was not at issue in *Medina.*

**32.** In making this causal inquiry, *Medina* instructs courts to "consider the chronological sequence of events and draw conclusions from the facts at hand." 683 F.2d at 442. *See also Robinson v. Kimbrough,* 652 F.2d 458, 466 (5th Cir.1981); *Nadeau v. Helgemoe, supra* note 31. From this sequence of events the court must determine whether it is more likely than not that fee claimants' participation contributed to defendant's action—so that the relief granted cannot be ascribed to other influences. *Cf.* W. PROSSER, LAW OF TORTS 236–241 (4th ed. 1971) (discussing "but for" causation standard).

**33.** *See* App. at 3 ("plaintiff-intervenors did, in some sense, prevail * * * by virtue of the fact they succeeded in having the affirmative action provisions of the consent decree modified").

**34.** *See* App. at 2 (affirmative action provisions and other parts of decree modified after plaintiff-intervenors protested their preliminary approval); App. at 5–6 (original negotiators agreed to modify proposed decree in response to fee claimants' intervention).

The District Court did state at one point that the original parties could have agreed to modify the provisions for any number of reasons. *See* App. at 6 n. 5. This conclusion is irrelevant to the causal inquiry since the court also stated that the original parties would not have

denied appellants "prevailing party" status because they had not proved "any sufficient threshold showing of real discrimination * * * to justify allowing [them] to shift their counsel fees to this defendant agency." App. 6. Though claimants clearly "believed the provisions would result in discrimination against their clients and * * * the original negotiators * * * agreed to modify [these provisions] after discussions with" the fee claimants, the court did not find facts sufficient "to support a threshold finding * * * that the provisions in issue did, in fact, propose and/or authorize actual discrimination against white males at GAO." App. 5–6.

■ On its face, the District Court's "threshold of discrimination" test, based as it is on sufficient facts in the record, see id., appears to hold fee claimants to a higher standard than the law requires.[35] Fee claimants do not have to show facts proving defendants "guilty, to some degree, of discrimination," see App. at 3–4, to establish their "prevailing party" status. To the contrary, for purposes of the attorney fees provisions, they need only allege a claim that is colorable under the civil rights laws—that has some minimum basis in law. See note 31 supra. This is a question of law, not fact.[36]

However, we hesitate to find that claimants were "prevailing parties" on the basis of the appellate record alone. Despite some broad statements that seemingly imposed an overly-demanding burden on appellants, see pages 339–340 supra, the District Court also found that claimants had not demonstrated that "these provisions would in fact have resulted in legally cognizable and actionable discrimination." Id. at 340. Arguably, this statement can be read as a conclusion, by the District Court, that fee claimants had not alleged a claim with colorable merit in Title VII law. On the other hand, the District Court's broader statements indicate that it may have been looking for something more than a non-frivolous claim. Thus we think a remand is appropriate so that the District Court can more carefully consider the petition in light of the appropriate standards of law, and thus clear up the confusion that now exists in its analysis.[37]

■ Of course, even if the District Court determines that appellants stated a

---

made any changes but for plaintiff-intervenors' efforts. See note 33 supra. The fact that defendant may have made the changes for other reasons is relevant, however, to the minimum basis in law inquiry because if the defendant conferred the benefits gratuitously or merely to avoid further litigation expense it is possible that the lawsuit was based solely on an harassment claim. See note 31 supra.

**35.** The District Court derived the "threshold of discrimination" test from two prior decisions in the courts of this circuit. In Grubbs v. Butz, 548 F.2d 973 (D.C.Cir.1976), this court reversed a District Court ruling that plaintiff could not proceed to lawsuit without exhausting certain administrative remedies. When plaintiff petitioned for attorney fees on the basis of this procedural victory, the court denied the petition on the ground that claimant had not made a threshold showing of discrimination. Id. at 975–976. But the court was clearly referring to the fact that plaintiff's initial victory was on a procedural, interlocutory issue—prior to trial on any of her discrimination claims—and thus she had not prevailed, at that point, on any claims advancing the policies underlying Title VII. Similarly, in Brown v. Boorstin, 471 F.Supp. 56 (D.D.C.1978), the District Court denied attorney fees to a plaintiff complaining he

was prejudiced by the Library of Congress' practice of recruiting and promoting on the basis of certain "preselection" criteria. But it was undisputed that none of these "preselection" criteria offended Title VII, and thus the District Court found the attorney fees provisions to be inapplicable. Id. at 57. Again, attorney fees were denied because plaintiff's claims had not advanced to a point, in trial or otherwise, where policies underlying Title VII had arguably been implicated.

**36.** Johnston v. Jago, supra note 31, 691 F.2d at 286; Nadeau v. Helgemoe, supra note 31. It is especially important that this inquiry be kept to relevant law where settlements are involved. Parties might otherwise continue litigating past the point where they would otherwise agree to end the suit to establish the necessary facts. See Maher v. Gagne, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980).

**37.** In all fairness to the District Court, it did not have the benefit of our discussion on these issues in Medina. The District Court decided this case on May 27, 1982, and we issued our opinion in Medina on July 2, 1982.

not wholly insubstantial Title VII claim, it might still find special circumstances that would render an award of attorney fees unjust. *See Newman v. Piggie Park Enterprises, Inc., supra,* 390 U.S. at 401, 402, 88 S.Ct. at 966. In deciding whether such special circumstances exist, the District Court can, for example, consider the "pyrrhic" nature of plaintiffs' victory.[38] *See Comm'rs Court of Medina County, Texas v. United States, supra,* 683 F.2d at 443. Similarly, it can consider whether claimants' intervention was timely[39] and whether their intervention was necessary to protect the policies embodied in Title VII.[40] But the District Court should *not* consider the absence of a finding of wrongdoing or the possibility that defendant was not motivated by bad faith.[41] Attorney fees are not designed merely to penalize defendants, but to encourage injured individuals to seek relief. *Newman v. Piggie Park Enterprises, Inc., supra,* 390 U.S. at 402, 88 S.Ct. at 966. Thus the determinative factor must be the role of plaintiffs' lawsuit, not the motivations of the defendant.

**38.** Even if fee claimants state a not wholly insubstantial claim, *see* note 31 *supra,* the net result obtained might be so insignificant that it would be unjust to shift plaintiffs' counsel fees to the defendant agency. *See Comm'rs Court of Medina County, Texas v. United States, supra* note 29, 683 F.2d at 442–443. Many of appellees' arguments in this case concern the significance of the benefits obtained. *Compare* brief of appellees at 13–16 (changes effectuated were insignificant) *with* brief of plaintiffs-intervenors-appellants at 37–40 (changes were significant) *and* reply brief of plaintiffs-intervenors-appellants at 13–17 (same). If, on remand, the District Court determines that fee claimants were prevailing parties, it can properly take these arguments into account in deciding whether special circumstances exist that would make the award unjust.

**39.** It appears to us, however, that appellants acted in a prompt and reasonable fashion in this litigation. Appellees make much of the fact that the *Miller* litigation began in the early 1970's, and that appellants filed their objections on the last day that comments could be filed. *See* brief for appellees at 2–3, 7, 13. But it seems equally clear that the *Miller* litigation went into a long period of dormancy, *see* notes 2–4 *supra* and accompanying text, and that appellants had no reason to know that it was alive again. Furthermore, appellants' supposed "eleventh hour" intervention was preceded by their desirable resort to formal and informal

## III. CONCLUSION

When the District Court applies an improper standard to a petition for attorney fees, this court must order the lower court to remedy its error. *Foster v. Boorstin,* 561 F.2d 340 (D.C.Cir.1977). We believe that the District Court's "threshold of discrimination" standard may have held appellants to a higher standard than is appropriate. Accordingly, we remand to the District Court for further proceedings on fee claimants' petition. The District Court must decide whether appellants have stated a not wholly insubstantial claim and, if they have, whether special circumstances exist that would render an award of attorney fees unjust.

*So ordered.*

administrative procedures. *See* notes 18–19 *supra* and accompanying text. However, the *amount* of the fee ultimately awarded may reflect the relatively minor role that appellants played after their prompt and reasonable intervention.

**40.** But since intervention has already been granted, the District Court should not reevaluate its decision on this issue unless new evidence has arisen. *Comm'rs Court of Medina County, Texas v. United States, supra* note 29, 683 F.2d at 443.

**41.** *Nadeau v. Helgemoe, supra* note 31, 581 F.2d at 280. Thus the fact that the offending provisions may have been suggested by the original plaintiffs, *see* App. at 5, is not a proper consideration for the District Court to take into account. It does not matter which party originated the offensive provisions; the operative concern is whether an employer has become party to and bound by a provision that implicates Title VII policies. The fact that another party agreed with or even originated a provision that implicates Title VII does not shield the employer from liability or from its obligation under Title VII to pay the plaintiff's fees in correcting the situation. Since GAO agreed to the provisions, it must bear any costs associated with them.