DISTRICT OF COLUMBIA, Appellant,

v.

JERRY M., et al., Appellees.

Nos. 88–626, 88–782 and 89–799.

District of Columbia Court of Appeals.

Argued Dec. 18, 1989.
Decided Feb. 12, 1990.

Edward E. Schwab, Asst. Corp. Counsel, with whom Herbert O. Reid, Acting Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, were on the brief, for appellant.

David A. Reiser, Public Defender Service, with whom Kim A. Taylor, Public Defender Service, James Klein, Public Defender Service, and Donna Wulkan were on the brief, for appellees.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

ROGERS, Chief Judge:

The reformers who championed the establishment of juvenile courts in the United States envisioned a system in which youthful law violators would receive treatment and other forms of rehabilitation and thereby become productive members of society without forever being tarnished by criminal records as a result of youthful indiscretions. *See In re Gault,* 387 U.S. 1, 15, 87 S.Ct. 1428, 1437, 18 L.Ed.2d 527 (1966). While the visions of the reformers did not always comport with the reality of juvenile court systems, hope persists that the system will work. Even today this hope appears not to be totally unrealistic in view of the experts' conclusion that "[c]onfined juveniles in the District of Columbia are, for the most part, neither violent nor chronic offenders."[1] Clearly, there is no lack of recognition of the need to expand the services that are available to such juveniles. On July 24, 1986, the parties agreed and the trial judge approved a Consent Decree that called for "an assessment and study of the juvenile population in existing YSA juvenile facilities ... to determine an appropriate configuration and design for the confinement of children in the custody of YSA."[2] In the view of the trial judge the Decree represented a "monumental effort" to bring about correction of conditions for such youth.

In this appeal the District of Columbia contends that the trial judge exceeded his authority under the Consent Decree in ordering the District to take actions to which it had not consented. Specifically, the District maintains that the judge erred in ordering (1) five secure decentralized facilities that would replace existing secure institutions, (2) a cap of 60 on the number of juveniles in residential placements outside the District, where there is no representative plaintiff and the question had not been at issue in the case, (3) a case management system that is the functional equivalent of a system previously agreed upon by the parties, and (4) broad-ranging management reforms in YSA. It further contends that the judge abused his discretion by ordering caps on the number of securely detained juveniles recommended by the Panel, but rejecting the Panel's recommendation for judicial reforms necessary to achieve the caps. Finally, the District contends that the judge erred in enforcing the one-juvenile-per-room provision of the Consent Decree by entering a new mandatory injunction to which the District never agreed, requiring that the District transfer juveniles to shelter or group homes within ten days of the determination that they are suitable for less secure confinement. Appellees respond that in view of the District's pervasive noncompliance with the

---

1. Beyer, Brown and DeMuro, Report of the Jerry M. Panel, submitted to the D.C. Superior Court, March 11, 1987, at 73 (Report).

2. YSA is the Youth Services Administration of the Commission on Social Services in the D.C. Department of Human Services. It is responsible for the confinement of children who are committed by the court to the custody of the District of Columbia government.

Decree for three and one half years, this court should, with one exception regarding decentralization of secure facilities, affirm because the trial judge did not impose any new duties on the District, but simply fleshed out the provisions of the decree in a more specific remedial order.

Finding ourselves in total agreement with the parties and the trial judge that improvements in the alternatives to secure detention are imperative for juveniles who do not require secure detention, we nevertheless conclude that portions of the judge's orders exceeded his authority under the Consent Decree. We do so with some reluctance since the District's record of compliance with the Decree leaves much to be desired and the judge exercised considerable restraint, on several occasions agreeing to the District's requests precisely because he acknowledged some of the bureaucratic and administrative problems that YSA was experiencing. Still, the Decree of July 24, 1986, was limited in scope and, in turn, limited what the judge was authorized to do in ordering compliance with it.

The Consent Decree agreed to by the parties, and approved by the trial judge, was limited to the design of placement alternatives for youth no longer requiring secure confinement, and expressly recognized that the requirement for secure placement of juveniles was subject to judicial authority beyond the control of the parties. Hence the orders of the trial judge regarding decentralization of the secure facilities, placements outside the District of Columbia, and the management of the YSA were beyond the scope of the four corners of the Decree and beyond the judge's authority. Otherwise we affirm. The trial judge recognized that the demo-

graphics of securely committed juveniles had changed since the Panel's report in adopting the Panel's cap recommendations. The decree as well as the judge's orders afforded the District the opportunity to adapt to changed circumstances and to submit new figures. See Order of April 8, 1988 and Memorandum Order "D," notes 14 & 16, *infra*. What the court did not do was ignore the District's agreement to implement a juvenile justice system with a variety of community based services and thereby reduce the time youth were inappropriately housed in secure facilities. Further, in view of the provisions of the Consent Decree designed to minimize the time that a juvenile remained in a secure facility if found suitable for less restrictive confinement, and the provisions of Memorandum Orders "C" and "D," note 16, *infra*, from which the District did not appeal, the judge did not exceed his authority in ordering, over three years after the decree had been entered, that the District remove children within ten days.

I

Jerry M., representing appellees, the class of detained[3] and committed[4] children confined at the District of Columbia's secure juvenile institutions, filed suit challenging the failure of the District of Columbia and those officials[5] responsible for administering the juvenile facilities (District) to provide appropriate care, rehabilitation, and treatment to them in violation of the Constitution and the District of Columbia Code. After extensive pretrial discovery and briefing, the parties presented a settlement agreement to the trial judge on July 17, 1986. Following a hearing on July 24, 1986, during which the parties responded to concerns raised by the trial judge, and mod-

---

**3.** These class members are confined awaiting a "factfinding hearing" (trial of guilt or innocence) or "disposition" (determination of the need for rehabilitation and the type of treatment required) pursuant to D.C.Code § 16–2313(b) (1989 Repl.).

**4.** These class members are placed in the custody of the Department of Human Services (DHS) for up to two years pursuant to D.C.Code § 16–2320 (1989 Repl.).

**5.** The public officials included the Mayor of the District of Columbia; the Director of the Department of Human Services (DHS), the Commissioner of Social Services; the Administrator of the Youth Services Administration; the Superintendent of Oak Hill; Cedar Knoll and the Receiving Home; and the Superintendent of Special Education of D.C. Public Schools.

ified their agreement accordingly, the judge approved the settlement agreement and entered the Consent Decree as a binding judgment.

The Consent Decree was based on three general principles. The first principle was "the right of children to be housed and provided services in the least restrictive setting consistent with the protection of the public, the youth's individual needs and with applicable court rules, statutory and constitutional provisions." The second principle was the right of a child not to be in secure confinement when capable of functioning effectively in a community based program. The third principle was that a child should remain in pretrial detention for the shortest possible period and in no event to exceed 30 days or, in the case of a pretrial shelter house placement, 45 days, but recognized that the presence of juveniles in pretrial detention for longer periods as a result of court delays would require the District to provide additional detention slots.

The Decree established a panel of three experts (Panel), one named by the appellees, one selected by the appellants, and one chosen by the parties, to "determine the appropriate number of juveniles in need of secure confinement in the District and to develop a system for appropriate care, services, and placement of securely confined juveniles in YSA custody." [6] The Decree

also appointed a monitor to make findings and recommendations "concerning steps to be taken to achieve compliance." The Panel was to base its determination of the number of children who could be securely confined on its "assessment of the current population within YSA custody," and to "prepare a specific comprehensive plan for the design, development, and implementation of community-based programming and alternatives with specific objectives and time tables in accordance with the [three general] principles set forth in [the Decree]." In addition, the Panel was to establish "standards and procedures as well as a mechanism for ongoing review and community placement of all detained and committed children confined in YSA custody." [7] Provision was made for exceptions in emergencies and the housing of a number of children in secure facilities in excess of the number provided in the Panel's plan as a result of a court order. Other provisions concerned conditions at institutions and required housing limitations,[8] minimum standards for staffing and training, improvements in diagnostic services, treatment planning through individual service plans (ISP) and Team Leaders, as well as education, recreational, and mental health services and medical services.[9] The Decree further provided that appellees would not seek to have the District defendants held in contempt of court so long as they had

6. By its terms the decree defined the plaintiff class as "all children who are or come to be confined in the three juvenile facilities, Oak Hill, Oak Hill Annex (also known as Cedar Knoll), and the Receiving Home for Children, operated by the District of Columbia, for so long as they are in YSA custody." "Facilities" and "institutions" were defined in the Decree to refer to the same three institutions "and their successors and any non-community based secure placements."

7. The Consent Decree required YSA to conduct monthly reviews of the status of all detained or committed children in its custody and to make "all reasonable and appropriate adjustments" to assure less secure confinement for a child. YSA also was to provide a daily count of the children in its custody, and to give notice when the number of securely held children would exceed 95 percent of the capacity called for in the Panel's plan and take appropriate steps to avoid exceeding the limit.

8. The Decree required the institutions to house children in single rooms, forbade construction of additional secure institutions unless recommended by the Panel, and mandated the closing of the Cedar Knoll institution by December 1, 1987, and that no more youth would be placed in it after June 1, 1987.

9. Article IV of the Decree provided a process to bring the institutions into compliance with the federal Education for All Handicapped Children Act and the American Public Health Association's Standards for Correctional Institutions (1986 ed.) section on Environmental Health and the American Correction Association's standards for vocational training. There also were provisions on disciplinary actions against juveniles, improvements in environmental conditions and medical services, children's rights, and publication of a student handbook. Articles V–X.

taken "all reasonable steps, employing their utmost diligence, to ensure substantial compliance with" this Decree.

The Panel submitted to the trial judge on March 11, 1987, its final plan of 48 recommendations which the Panel advised were "intrinsically connected to one another." The Panel explicitly stated, however, that it did "not attempt to address issues of implementation" and that its report "should not be considered a detailed work plan." [10] The recommendations revolved around four areas that the panelists considered to be prerequisites for change: YSA accountability based on an integrated case management system; expansion of the options in the service delivery system; emphasis on the neighborhood in an effort to strengthen families and thereby reduce delinquency; and a cooperative public-private partnership. Specifically, the plan included increased use of diversion from prosecution, temporary housing for youth whose parents cannot be located, increased use of "home detention," short term foster care, alternatives to secure detention, creation of therapeutic group homes for committed youths, creation of programs for juvenile drug users including new treatment facilities and youth-run businesses; regular review of placements; increased involvement of community groups in providing services; and improved record keeping and monitoring of placements. It also explicitly called for the Family Division to assure faster processing of juvenile cases within 180 days.[11] The plan envisioned a detention program approximately half the size of that then in existence.[12]

The parties filed written responses to the plan, and on October 9, 1987, the trial judge issued Memorandum Order "A," approving the Panel's plan with modifications.[13] The District thereafter filed a mo-

---

**10.** The Panel gave two reasons for the limitation: first, the litigants and the court would review the report before a final plan was adopted, and second, many of the recommendations were "intrinsically related to one another (e.g. the need for secure detention beds is directly related to how completely and in what time frame the recommendations concerning speedy trial are accepted and implemented)."

**11.** The Panel report noted that "unusually long delays in juvenile cases and high juvenile detention rates result in the District of Columbia government being required to provide a disproportionately larger number of juvenile detention beds than other cities and states with greater juvenile populations." Report at 8. It cited as causes of the delays an insufficient number of judges available to preside over trials and dispositions in the Family Division, slow drug analysis by the Federal Drug Enforcement Administration, inadequate commitment alternatives, a time-consuming residential placement process, and too few defense attorneys and prosecutors. *Id.* In addition to suggesting an individual calendar system for the Family Division, the report stated that most trials for juveniles in secure detention should occur within 20 days of the detention hearing and within 30 days for those in shelter houses. The report also called for a two-track scheduling system with most secure cases reaching disposition within 30 days of arrest and a small number of the more difficult cases requiring 45 days, secure detention cases taking priority. *Id.* at 8–9. A number of other court-related recommendations addressed other ways to reduce delays in handling juvenile cases. "The recommendations regarding delay in court processing can be achieved in 180 days." *Id.* at 19. Thus, the Panel concluded, within another 180 days, there should be a need for only 42 secure detention beds. *Id.*

**12.** The plan analysis was as follows:

| Current options: | | Proposed options *: | |
|---|---|---|---|
| home detention | 190 | home detention | 150 |
| foster homes | 10 | foster homes | 15 |
| 9 shelter houses | 80 | 6 shelter houses | 54 |
| Receiving Home | 37 | 2 staff secure | |
| Cedar Knoll | 106 | shelter houses | 16 |
| Oak Hill | 62 | secure detention | 42 |
| TOTAL | 485 | TOTAL | 277 |

\* if all recommendations are followed

Report at 19.

**13.** MEMORANDUM ORDER "A" omitted the Panel's recommendations for faster processing of juvenile cases in the Family Division. See note 11, *supra.* It directed the District to bring the length of detention closer to national standards by (1) putting in place within 60 days a process for reviewing the need of securely detained juveniles and publishing written standards and procedures; (2) establishing more consistent supervision over children in the home detention program and coordinating that program with the Public Schools, providing improved services to children and their families; (3) within 90 days, providing temporary housing and transportation for children whose parents cannot be located; (4) reducing the number of juveniles in secure detention who can be placed in home detention; (5) within 6 months, expanding short-term foster care facilities to 15

tion to alter or amend Memorandum Order "A" on the grounds that the trial judge had altered the Panel's plan by eliminating the commitment of the judiciary to prompt hearings, and that the data relied on by the Panel were no longer current in light of the number of juveniles ordered held in secure detention and the sharp rise in the percentage of such juveniles with drug charges (from 19% to 40%). The judge denied the motion on April 8, 1988. While acknowledging that the demographics, as the District maintained, appeared to have changed in the past year, the judge placed the obligation on the District to present a proposal matching current realities.[14] On March 28, 1988, in response to Memorandum Order "A," the District had submitted what, in the judge's view, was "an impressive sixty-eight (68) page plan to the Court that provided for an expanded continuum of care," that was "broader in some respects than

Memorandum Order 'A,' [but] on its face ... not fully responsive to the Court's Order." The trial judge issued written interrogatories to the parties on April 29, 1988, and following a hearing on May 9, 1988, issued Memorandum Order "B" on May 20, 1988, which reaffirmed the Panel plan and, "[w]ith reluctance," adopted the District's requests for extended periods of time in which to comply.[15] The District noted an appeal from Memorandum Order "A" on May 9, 1988, and appealed Memorandum Order "B" on June 20, 1988. The District also appeals the trial court's Memorandum Order "E," dated May 24, 1989, ordering sanctions and remedial relief based on its March 10, 1989, determination that the District was in contempt of both the Consent Decree and Memorandum Order "C," dated October 14, 1988.[16] All appeals were consolidated.

beds as a detention alternative for securely held juveniles and operating staff secure shelter houses with 16 beds for fugitives, runaways and absconders. The court also ordered staff training and additional resources and a streamlining of the residential placement process.

The District was given 120 days to expand its contracts in order to reduce delays in residential placements, and directed to take specific actions regarding the Interagency Youth Project, vocational program, youth run businesses, YSA's foster home capacity, and secure group therapeutic homes for committed drug abusers.

The District was directed to put into operation within a year five 12-bed decentralized secure programs for violent and chronic offenders and reduce the number of committed delinquents in residential treatment outside the city to no more than 60.

Memorandum Order "A" also required a system for individualized assessment needs, decentralization of case managers carrying maximum caseloads of 20 with the capacity to purchase services, and treatment plan reviews every three months. It directed the use of standardized information sheets on each youth and a variety of personnel actions for staff consistent with a reorganization of YSA staff desired by the District.

The District was directed to meet with members of the Panel to develop a detailed implementation plan within 45 days. The plan was to include no more than 42 secure beds, 60 residential treatment placements outside the city, and 60 securely confined committed delinquents.

14. *ORDER*, dated April 8, 1988, denied the District's motion to alter or amend Memorandum

Order "A." The judge noted that in the 20 months since the Decree had become effective, he knew of no semi-annual meetings conducted by the District to review operation of the juvenile justice system in accordance with the general principles of the Consent Decree. He further acknowledged that the demographics might have changed but that the District, having been ordered to plan and not to implement, had the burden of "com[ing] forward with a reasoned analysis of a configuration that matches current realities," and that the District had ceded some of its management prerogatives in the decree.

15. In *MEMORANDUM ORDER "B,"* the court explained that it had extended the District's time to comply for two reasons: first, because the District planned to implement the plan incrementally, and second, in recognition of management changes at the top of DHS and the Commission of Social Services.

16. Thereafter, following the filing on May 6, 1988, by appellees of a motion for emergency relief to reduce overcrowding at the Children's Center, the trial judge issued Memorandum Order "C" on October 14, 1988, after the parties were unable to mediate their differences.

*MEMORANDUM ORDER "C,"* dated October 14, 1988, directed the District to carry out its short term implementation plan, submitted to the court on October 4, 1988, to remedy overcrowding and understaffing in YSA and reduce the population in YSA to 60 by January 31, 1989. The District was to hire staff, conduct a classification review and out-place eligible juveniles by December 15, 1988, increase clients in the Interagency Youth Project to 30 by December 15, 1988, and review home detention place-

## II

■ *Waiver of Appellate Rights.*[17] We address first appellees' threshold contention that the District's appeals must be dismissed because the plain meaning of the waiver section of the Consent Decree prohibits the District from appealing.[18] The District maintains that it did not waive its right of appeal from those aspects of the trial judge's orders that exceed the Decree's delegation of authority to the Panel and the trial court. Included in these are the trial judge's orders altering the Panel's final plan by accepting numbers included in the Panel's recommendations while rejecting its recommendations for reform of the Superior Court Family Division procedures.

By its plain terms, the Decree provides that either party may appeal from those portions of the orders which modify the Panel's final plan. Although the trial judge had no authority to order changes in Superior Court practice,[19] the judge's deletions of the Panel's recommendations regarding the procedures of the Superior Court Family Division constitute a modifi-

ments. Also, the District was to open two facilities and within 45 days move all youth awaiting group home placement. The District was to reduce its institutional population to single room capacity by the end of the year. On November 28, 1988, the trial judge issued Memorandum Order "D" denying the District's motion to alter or amend Order "C."

MEMORANDUM ORDER "D," dated November 28, 1988, rejected the District's explanations for its shortfall and hiring freeze and an increase in the number of judicial juvenile commitments. The judge observed that since the entry of the Decree two years earlier, the District had "failed to comply with practically every provision of the Decree," including failure to comply with the Cedar Knoll closure commitment. The judge noted that the District's motion "raises indirectly the issue of amending the Consent Decree" in its statement that "it is uncontroverted that Cedar Knoll will remain open for the foreseeable future." To assist in determining whether to issue remedial orders compelling the District to comply with its own agreement, the judge directed the Monitor "to ascertain ... whether the limits of institutional population recommended by the panel remain consistent with the Decree and the needs of youth detained and committed."

On March 10, 1989, the judge held the District in civil contempt of court. The CONTEMPT ORDER found the District in contempt with respect to the population provisions and single room provisions of the Consent Decree. It also found that the District had failed to establish the classification review and to increase the number of clients in the Interagency Youth Program to 30 and to open two ten-bed group home or shelter facilities as set forth in Memorandum Order "C." The order directed the District to reduce the waiting list for juveniles awaiting group home placements to ten days. Following hearings that focused on the harm caused to the juveniles who were to benefit from the Decree by the District's noncompliance, the court issued MEMORANDUM ORDER "E," dated May 24, 1989, directing that by September 1, 1989, the District comply with the single room requirements for the Receiving Home and Oak Hill, and between June 1 and that date house no

more than 42 and 165 persons, respectively, at those institutions. The court prohibited expansion of Cedar Knoll after June 1, 1989. Further, by August 1, 1989, the District was to reduce the waiting time for group or shelter home space to no more than ten days. Memorandum Order "E" also imposed monetary fines of $100 a day per child for violations at each facility and $1,000 a day for violation of the single room cap at either facility. To assure compliance the District was directed to submit monthly reports, the Panel was to establish a priority list of services needed by the Jerry M. class, and the Monitor was to use the fines to implement the service list developed by the Panel.

MEMORANDUM ORDER "F," dated July 27, 1989, denied the District's motion for a stay of provisions of Order "E," including payment of the fines and the delegations of authority to the Panel and the Monitor. While acknowledging the District's substantial compliance in hiring staff, the judge noted its failures to reduce institutional populations.

17. The District's appeal of Memorandum Order "A" is timely based on its notice of appeal, dated May 9, 1988. The time for appeal was tolled while the trial court considered the District's timely motion to alter or amend its order. D.C. App.R. 4(a)(2) (1989). The trial judge denied the District's motion in an order dated April 8, 1988. The District then had until Sunday, May 8, 1988, to file a timely notice of appeal. The period to file a notice of appeal was extended to Monday, May 9, 1988, because the last day of the filing period was a Sunday. D.C.App.R. 26(a) (1989).

18. The Consent Decree provided:

[t]he parties will not seek a stay of, or appeal from, those portions of the order affirming the Panel's plan, except that neither party waives the right, if any exists, to seek a stay of or appeal from those portions which modify the final plan submitted to the court by the Panel.

19. The Superior Court was not a party and was therefore not bound by the Consent Decree.

cation of the Panel's final plan, and are therefore appealable under the term of the waiver claim. Obviously, every minor revision of the Plan would not give rise to an appealable issue since the waiver of appellate rights was an important part of the parties' agreement, and they are bound to it as it is incorporated into the Consent Decree. But the fundamental linkage between the Panel's recommended caps and the changes in Superior Court procedures is clear from the Panel's report. Under these circumstances we are satisfied that the District could not have intended to agree to the caps without simultaneous changes in court procedures. Nor can the waiver provision be read to waive the right to appeal an order on the ground that it exceeds the scope of the Decree. *See Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 575–76, 104 S.Ct. 2576, 2586, 81 L.Ed.2d 483 (1984); *Baker Industries Inc. v. Cerberus, Ltd.,* 570 F.Supp. 1237, 1259 (D.N.J.1983), *aff'd,* 764 F.2d 204 (3d Cir.1985) (master's findings not final, hence may be appealed, to extent "he exceeded the scope of his reference").

### III

■ *Superior Court Authority under the Consent Decree.* A consent decree is a strange hybrid of a contract, negotiated by the parties, and a court order, which can be altered by a court if "circumstances" warrant. *Brown v. Neeb,* 644 F.2d 551, 557 (6th Cir.1981). Of particular relevance is the observation of the Supreme Court that

[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus, the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other,

and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties.

*United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971) (emphasis in original) (footnote omitted). *See Firefighters Local Union No. 1784 v. Stotts, supra,* 467 U.S. at 574, 104 S.Ct. at 2585. Therefore, a consent decree is construed as a valid contract between the parties and its scope "must be determined from within its four corners." *Baker v. District of Columbia,* 494 A.2d 1299, 1302 (D.C.1985) (citing *Commodity Futures Trading Commission v. Premex, Inc.,* 655 F.2d 779, 782 (7th Cir. 1981)). *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 233–37, 95 S.Ct. 926, 932–35, 43 L.Ed.2d 148 (1975); *Armour, supra,* 402 U.S. at 682, 91 S.Ct. at 1757; *United States v. Atlantic Refining,* 360 U.S. 19, 20–24, 79 S.Ct. 944, 945–47, 3 L.Ed.2d 1054 (1959). However, the trial judge's interpretation of a Consent Decree is entitled to deference; "few persons are in a better position to understand the meaning of a consent decree than the judge who oversaw and approved it." *Brown v. Neeb, supra,* 644 F.2d at 558 n. 12. *See United States v. City of Chicago,* 717 F.2d 378, 382 (7th Cir.1983).

In contending that the Superior Court exceeded its authority under the Consent Decree, the District argues: (1) the trial court erred in ordering the District to plan for a juvenile justice system with fewer securely detained and committed juveniles without implementing the Panel's recommended reforms for case processing in the Superior Court's Family Division; (2) the provision of five decentralized secure facilities with bed slots equal to the number of secure beds in the entire system is tantamount to closing Oak Hill, which the Decree contemplated would remain open; (3) the trial court and the Panel were limited

by the Consent Decree to planning only for non-secure alternatives to secure confinement; and (4) the trial court and the Panel lacked the authority to restrict the number of residential placements outside the District of Columbia, because the Panel was to restrict itself to District institutions and placement. In general, the District maintains that the trial judge construed the Consent Decree as broadening the authority delegated to the Panel, including authority not contemplated by the parties or discernible from the four corners of the Consent Decree.[20] Appellees respond that the judge acted within his authority to assure the District's compliance with the Consent Decree.

Because the trial judge's authority to assure compliance by the District government with the Consent Decree turns on the scope of the Decree, we have set forth the provisions of the Decree and the judge's orders in some detail. While considerable deference is due the trial judge's interpretation of the scope of the Decree,[21] that deference must be informed by the record of the proceedings before the trial judge. The Consent Decree contemplated that by 1989 the District would have in place community-based facilities in sufficient numbers and variety so that juveniles eligible for release from secure facilities could be very quickly placed.[22] Three years after the Decree took effect the District has not accomplished this goal.[23] Any number of explanations were presented to the trial judge, but the question is whether, and in what respects (if any), it was beyond the authority of the trial judge to impose the sanctions that he did.[24]

### A.

We summarize the bases for our conclusions. First, contrary to appellees' assertions on appeal, the Consent Decree did not call for the complete reform of the juvenile justice system in the District of Columbia. Quite specifically, the Decree called for the development and design of community-based facilities as alternatives to the secure facilities housing youth for whom such detention was not required. At the July 24, 1987, hearing before the trial judge the parties agreed that the Decree did not address the District's secure facilities, which were to continue in operation, nor did it reach into the administration of the programs to be carried on in the community-based facilities or address the issue of those children who went directly to group homes or other non-secure facilities. Rath-

20. Specifically, the District contends that the Consent Decree does not authorize five twelve-bed decentralized secure programs for violent chronic offenders or a reduction in the number of committed delinquents in residential treatment outside the geographic parameters of the District to more than sixty; the trial court has no authority to order system-wide improvements in the internal operations and case management system of the Youth Services Administration (YSA).

21. As appellees point out, deference is due here because the Decree was open-ended to the extent that it created a mechanism for creating a continuum of community based facilities, and because it involved options and cases of a kind familiar to Family Division judges, and the trial judge had posed a series of questions to the parties about their intent before accepting their agreement.

22. Article II(L) of the Decree provided that three years after its entry the District could move for dissolution of the monitorship, which appellees would not oppose upon a showing "of sustained and satisfactory implementation and substantial compliance in all areas of the Decree."

23. Appellees' brief, filed November 27, 1989, points out that still unfulfilled are the District's promises to close Cedar Knoll, improve conditions at Oak Hill and the Receiving Home, upgrade educational programs, medical care and mental health treatment, and reduce institutional populations.

24. Nearly thirty years ago, a juvenile court judge, and now senior judge of the Superior Court of the District of Columbia, observed that if the promise of the juvenile court is to be fulfilled—that is, that the substitution of state control for parental control premised on the assumption that the state will act in the best interests of the child and that its intervention will affirmatively enhance the child's welfare—then "the mantle of leadership" falls on the judges involved with juvenile proceedings to assure that the state keep its part of the bargain. Orman W. Ketcham, "The Unfulfilled Promise of the Juvenile Court," *Crime and Delinquency*, April 1961, *National Council on Crime and Delinquency* (N.Y.N.Y.), at 100, 110.

er, the Decree focused on the use of jointly-selected experts to design the services and facilities needed as alternatives for youth unnecessarily being held in secure detention, and the use of a monitor to advise the court on the District's progress or lack thereof in implementing the plan. Indeed, the trial judge explicitly recognized the limits of the Decree when he commented that it was his hope that the larger effort needed to accomplish the broader goals identified by the Panel would occur.

Second, nothing in the Consent Decree suggests that it was frozen in time insofar as the youth population to be served was concerned. At the July 24, 1987, hearing the parties and the trial judge agreed that the Decree could not limit the authority of the Family Division judges to commit juveniles to secure facilities. The Decree acknowledged the judicial authority to order secure detention that would require the District to maintain additional secure placements. In addition, it provided for semi-annual meetings between executive and judicial branch representatives to address whether the juvenile justice system was functioning consistently with the Decree. The Panel Report expressly contemplated that its recommendations could not be implemented without further review by the parties and the court so that a detailed and realistic work plan for implementation could be developed. The report contemplated further that time would be required since not only were additional staff and programs necessary, but budget requests would have to be approved and court procedures adjusted in some respects.

Third, the District clearly understood that it had committed itself under the Consent Decree to developing a variety of alternative services and community based facilities. As this court has recently reemphasized, parties must obey court orders. *See D.D. v. M.T.*, 550 A.2d 37 (D.C.1988). In view of the District's failure to take what the judge correctly characterized as minimal steps to ensure collaboration among the various elements of the executive branch, the passage of time, and the fact that rigid conformance with the Decree has never been ordered, the trial judge

properly rejected some of the District's objections to the court's omission of the Panel's directions for judicial reforms. The judge acknowledged that the District's information about the number and types of commitments appeared to show a change in the relevant demographics, and issued an order that provided the District with the opportunity to come back to the court with a new configuration, "fully anticipat[ing] [that the numbers] ... might not be feasible...." See Order of April 8, 1988, note 14, *supra.* The judge subsequently directed the Monitor to evaluate whether the needs of the institutional population had changed since the Panel had made its recommendations. See Memorandum Order "E," note 16, *supra.* Under these circumstances, the judge could properly reject the District's bureaucratic explanations of its delay and direct it to respond with a specific plan to address changes needed in the comprehensive juvenile justice plan. The record makes clear that the judge was directing the District only to live up to its commitment to implement a program that would more quickly move youth out of secure facilities and into the facilities they needed. Hence, the record supports the judge's conclusion that "[t]he suggestion ... that such a change in population has somehow obstructed [the District] from living up to the three year old commitment is bogus. No such external forces have prevented the establishment of the continuum of programs necessary to better and more comprehensively service the troubled youth of this community."

Fourth, the parties made it clear at the July 24, 1986, hearing that, in agreeing to the Consent Decree, the YSA was not surrendering its responsibilities for administration of the juvenile facilities and the programs in the facilities. The Decree placed a number of responsibilities on the YSA, and the Panel's plan added others. The administrative means by which it fulfilled those responsibilities remained, however, for YSA to determine. The responsibility to select these means was not transferred to the court or, as ordered by the court, to the Panel. It is readily under-

standable that, as the District continued to miss deadlines, the judge experienced great frustration in achieving the District's compliance with the Consent Decree. The options available to the judge, however, did not include redesigning and reordering the administration of YSA.

Fifth, the District has not helped its cause in this case since its delays were so *often* due to matters within its control. Indeed, the trial judge showed considerable understanding of the District's problems when he took into account the turmoil in YSA as a result of reorganizations and the new administrator's explanation that without internal management reforms compliance with the Consent Decree was not possible. As the trial judge observed, "[i]t appears in retrospect that defendants entered into the Decree without a full appreciation of the liabilities facing any administration of YSA attempting to implement the changes required by the Decree." Still, the new management at YSA was a hopeful sign, in the judge's view, that "YSA appears to be over the worst of its internal reorganizations turmoil, and YSA managers can turn their attention to moving forward in implementing this Order and generally complying with the Decree." Further, the record fully supports the trial judge's finding in Memorandum Order "E," note 16, *supra*, that the District had ample time and opportunity over a three year period to develop new detention and commitment alternatives. While we conclude that *the trial judge exceeded his authority* with respect to some of the remedial steps he ordered, he did not err in finding that the District had failed to meet its basic commitment under the Decree to develop a broad range of alternative community based services and facilities.

## B.

■ With this background we turn to the District's specific contentions on appeal.

The trial court did not abuse its discretion by *refusing to bind the Superior Court to the parties' consent decree.* The parties addressed this issue with the trial judge prior to signing the decree. The proposed Consent Decree was amended at the direction of the trial judge specifically to remove any language which appeared to bind Superior Court judges. The District cannot now successfully raise the same issue years later. Further, as noted above, the District was not without recourse. Not only did the Decree recognize that the District had to respond to judicial commitment orders, but the District committed itself to holding

> semi-annual meetings convened by the Mayor or his designee of the pertinent officials in the juvenile justice process, including the monitor of this Decree and the Corporation Counsel or his designee, the Director of the Public Defender Service or her designee and representatives from the Family Trial Lawyers Association, to discuss whether the juvenile justice system is operating consistent with the principles set forth in section I(A)(1).

The trial judge noted the District had not held such a meeting during the twenty (20) months following the signing of the Consent Decree and found the District "disingenuous" in its attempt to avoid its responsibilities under the decree by citing court's unwillingness to bind itself.

As to the cap on the number of secure beds, the Decree expressly directed the Panel to "determine the number of children that the District of Columbia may confine in secure facilities in accordance with the principles set forth in Section A." The Panel did so, recommending that the District confine no more than 42 detained and 60 committed youths. Report at 168–71. The Decree expressly directs the Panel to set a maximum number, subject to the court's approval. The plain language of the Decree makes it clear that this recommendation of the Panel was within the boundaries of its directive. For reasons previously noted, since the Decree included the leeway for judicial commitments, the judge's deletion of those portions of the Panel's recommendations relating to faster court proceedings of cases did not place the District in an impossible position; indeed, it has never so argued. In any event, neither

appellees nor the trial judge enforced the provisions of the Decree that called for the District to close Cedar Knoll, thus leaving 138 additional single room secure beds and 68 dormitory beds above the cap.

We agree with the District, however, that the Panel and the trial judge were limited by the Consent Decree to plan only for non-secure alternatives to secure confinement.[25] The Panel concluded that small, decentralized and specialized treatment programs are more effective than more restrictive large institutions. The Decree is itself replete with references to community based alternatives to existing institutions, but makes no reference to decentralization of secure facilities. The parties were clear that the Panel was limited to recommending the number of secure beds and was not to make recommendations about the programs to be used in secure facilities. Inclusion in the Decree of the pages on improvements at Oak Hill and the Receiving Home in staffing, programs, resident rights and discipline, and services, is written evidence of the parties' understanding that these institutions would continue in existence.[26] The judge's acknowledgment that the Panel's proposals went beyond the Decree in some respects, when he expressed his hope that the district would implement even those panel recommendations, seems apt here.

Additionally, we find no basis for the Panel to address the number of residential placements outside the boundaries of the District of Columbia. The Decree refers to community based facilities and to juveniles within the plaintiff class who are in District of Columbia facilities. This is different from out-of-city placements in non-D.C. facilities and from youths in residential placements, neither of which were contemplated by the parties as falling within the scope of the Decree. If available, the Panel advised, "local therapeutic group care, specialized foster care, and nonresidential psychoeducational, drug, and intensive job training programs could more effectively meet the needs of some youth than residential treatment centers." By substituting a local network in place of out-of-state residential placements, the Panel expected to reduce delays, improve the quality of services, and save money. Even though the rationale underlying the Panel's recommendation makes sense, the Consent Decree addressed only the needs of youth improperly retained in the District's secure facilities because of a lack of appropriate community-based alternatives and was not a cure-all for the District's institutional programs. The Panel's broad mandate to construct "a specific comprehensive plan for the design, development, and implementation of community-based programming" is limited by the context in which the Decree was entered. A fair reading of the record, as appellees appeared to concede at oral argument, shows that out-of-state facilities were not contemplated within the compromise Consent Decree arising out of appellee's lawsuit on behalf of youths in secure facilities.

Finally, we agree with the District that in limited respects Memorandum Order "A" impermissibly impinges on YSA's management prerogatives. While the Consent Decree challenged the Panel to "establish standards and procedures as well as a

---

**25.** The Consent Decree itself contained elaborate provisions for reform of YSA secure confinement facilities.

**26.** Thus, when the Panel stated that "The District should close Oak Hill and Cedar Knoll and replace these institutions with a broad array of alternatives, because we know that there is a better way to treat youth—even violent and serious offenders—than in large institutions," it expressed sentiments with which many might agree but which are nowhere embodied in the Consent Decree.

We do not agree with the District that the Panel's plan for secure beds is tantamount to closing the Oak Hill facility. The Panel's plan called for a total of 102 secure spaces—42 for detained youths and 60 for committed youths. The proposed decentralized facilities would not absorb the entire confined population. In addition, the trial judge only directed the District to plan for a system with 60 securely confined delinquents and did not ultimately determine whether the additional decentralized programs would be used in addition to, or instead of, other secure facilities. In any event, the parties had agreed only to close Cedar Knoll, not Oak Hill.

mechanism for the on-going review of all detained and committed children confined in YSA custody," the July 24, 1986, hearing made it clear that the parties contemplated that YSA would retain administrative responsibility for implementing the Panel's plan, including quality assurance review. Indeed, the Panel emphasized the importance to the success of its plan of having YSA assume responsibility, and the trial judge's own recognition that YSA's internal reorganization turmoil was finally at an end was further acknowledgment that day to day management and administration remained with the agency, not the court, the Panel or the Monitor. Although, as the judge correctly found, YSA had surrendered some of its management prerogatives in the Decree, specifically with regard to the habilitation assessment of children, it did not surrender them all, and those it surrendered were of a decidedly different nature from the budget, data processing, personnel and contracting functions at issue in Memorandum Order "B." Further, the parties also recognized that existing budgetary and personnel systems for the executive branch would remain applicable when the Decree became effective.

Appellees maintain that the case management system developed by the Panel did not duplicate the treatment team concept in the Decree since the latter addressed institutionalized juveniles while the former case management system developed by the Panel focused on continuous monitoring of youth in community placements as well as institutions. Even so, nothing suggests that YSA intended the Panel or the trial court to plan such managerial reform of YSA as would cause it to surrender control over the caseloads of case managers. The Panel's recommended maximum caseload of 20 for each case manager

of non-institutionalized youth is quite different from the limitations agreed to by the parties as part of the Consent Decree, which called for an assessment mechanism and limited the ratio of staff to residents in several instances.[27] While the Monitor's semi-annual reports made it clear, and YSA officials themselves conceded, that it would be impossible for YSA to comply with the Consent Decree without improving its management, management changes were made, and the judge acknowledged, in finding the District to be in contempt, that the District had taken steps toward future compliance, albeit too little too late.

## IV

■ *Contempt.* Civil contempt is a sanction designed to enforce compliance with an order of the court. *D.D. v. M.T., supra*, 550 A.2d at 43 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Zapata v. Zapata*, 499 A.2d 905, 908 (D.C. 1985)). As noted above, a consent order is "indistinguishable in its legal effect from any other court order, and therefore subject to enforcement like any other court order." *Moore v. Jones*, 542 A.2d 1253, 1254 (D.C.1988) (quoting *Padgett v. Padgett*, 472 A.2d 849, 852 (D.C.1984)). Consequently, a consent decree is a court order which may be enforced by contempt. *D.D. v. M.T., supra*, 550 A.2d at 44.[28] Where the purpose of contempt is to compel a party to comply, the court "must consider the character and magnitude of the harm threatened by the continued violation, and the probable effectiveness of any suggested sanction in bringing about the desired result." *United States v. United Mine Workers*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947) (footnote omitted).

27. The Consent Decree sets limits on the ratio of staff to youth in certain categories, such as cottage life 1:10; treatment team leaders to youth 1:100 and 1:300, respectively; recreation specialists to youth 1:50; social workers to youth 1:40; special education teachers to youth 1:10; and regular academic teachers to youth 1:15.

28. As pointed in *D.D. v. M.T.*:

Courts have a right to demand, and do insist upon, full and unstinting compliance with their commands. One who is subject to a court order has the obligation to obey it honestly and fairly, and to take all necessary steps to render it effective.... Indeed, he or she must be diligent and energetic in carrying out the orders of the court, and a token effort to comply will not do.
*Id.* (citations omitted).

"The decision whether to hold a party in civil contempt is confided to the sound discretion of the trial judge, and will be reversed on appeal only upon a clear showing of abuse of discretion." *D.D. v. M.T., supra*, 550 A.2d at 44. Similarly, the trial judge enjoys broad discretionary powers in designing appropriate orders for contemptuous conduct. *Hubbard v. Fleet Mortgage Co.*, 810 F.2d 778, 782 (8th Cir.1987) ("In contempt cases, the trial court has discretion to fashion the punishment to fit the circumstances." (citing *United Mine Workers, supra*, 330 U.S. at 303, 67 S.Ct. at 701). *See also In re Arthur Teacher's Franchisee Litigation*, 689 F.2d 1150, 1158–59 (3d Cir.1982) ("[d]istrict courts have broad powers to fashion remedial relief in civil contempt proceedings ... [and] ... may require the contemnor to perform various affirmative acts, even though these actions were not mandated by the underlying decree."); *Perfect Fit Industries Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir.1982) (district court has broad discretion to design a remedy that will bring about compliance where purpose of civil contempt is coercive). A contemnor may be subject to a staggering daily fine. *United States v. City of Yonkers, N.Y.*, 856 F.2d 444 (2d Cir.1988), *aff'd in part, rev'd in part, —— U.S. ——*, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (city conditionally fined up to $1,000,000.00 per day). *See United Mine Workers, supra*, 330 U.S. at 303, 67 S.Ct. at 701. Finally, there is precedent for imposing monetary sanctions for violations of population provisions in correctional settings as a sanction for contempt of court orders. *12 John Does v. District of Columbia*, 272 U.S.App.D.C. 235, 855 F.2d 874, 878 (1988); *Mobile County Jail Inmates v. Purvis*, 551 F.Supp. 92 (S.D.Ala.1982).

The District maintains that the trial judge exceeded his equitable powers when he chose to enforce the provisions of the

Decree prohibiting more than one child per room at the District's three secure institutions. Specifically, the District argues that the trial judge's finding of contempt and his remedial order, Memorandum Order "E," setting a ten day transfer period ceiling subject to fine for violation, lack "essential findings necessary to support any injunction relating to the adequacy of legal remedies and irreparable harm." The District points out that its own October 4, 1988, plan designed to remedy the population and staffing problems faced by YSA was improperly supplemented in the trial judge's order of October 14, 1988, by the demands of appellees. See Memorandum Order "C," note 16, *supra* (setting a 45 day period for transfers and new facilities openings and requiring the District to comply with the single room requirement by December 31, 1988). The District argues that the Decree did not authorize extraordinary relief of 10–day transfers subject to fine and that the trial judge's rationale is faulty since the injunction is "wholly independent of the 'one child per room' requirements of the consent decree."

■ The District's contention that the trial judge's sanctions impose an obligation on the District without its consent misses the mark. The District has already consented to be bound by the Consent Decree as an order of the Superior Court. Further, much of what the judge ordered was based on the District's own plan, submitted October 4, 1988, and on Memorandum Orders "C" and "D," *see* note 16, *supra*, from which the District did not appeal. The trial court does not require a party's permission before it may impose sanctions on that party in order to induce compliance with the trial court order.[29]

■ In support of its contention the District cites cases where a party has applied to the court for an injunction. *Firefighters*

---

**29.** The District's contention that the trial court has only three options open to it, to accept the proposed settlement, to reject it and postpone trial to see if a different settlement can be arranged, or to try the case, is relevant only at the stage when the trial judge was presented with the parties' agreement, on July 17, 1986.

Having accepted the parties' agreement, with modifications to which they also agreed, on July 24, 1986, the issue facing the judge more than three years later was how to coerce the District into complying with the Decree. The options available to a trial judge in order to coerce compliance are numerous even if not unlimited.

*Local Union No. 1784 v. Stotts, supra,* 467 U.S. at 575, 104 S.Ct. at 2586 (relief not authorized by language of the decree); *Hughes v. United States,* 342 U.S. 353, 357, 72 S.Ct. 306, 308, 96 L.Ed. 394 (1952) (grant of injunction reversed because language of decree did not support requirement of injunction); *Atlantic Refining, supra,* 360 U.S. at 23, 79 S.Ct. at 946 (injunction denied because circumstances did not warrant court substantially changing the terms of the consent decree). In addition, the District relies on a case which addresses the limits governing a trial court's interpretation of a consent decree. *Armour, supra,* 402 U.S. at 682, 91 S.Ct. at 1757 (consent decree does not have underlying purposes which can be effected through later remedial orders of a trial court).

The District, however, can hardly maintain persuasively at this point that it did not agree to reduce to the maximum extent possible the waiting period for the transfer of youth in secure institutions to community-based programs more appropriate for their needs. It has not claimed that it has fulfilled its commitments under the Consent Decree. The record amply demonstrates that the trial judge accorded the District opportunities and time to reach the goals that were in the Decree.[30] It further amply supports the judge's finding of the relationship between overcrowding and delays in transferring youth to community based facilities and disposes of the District's contention that the judge did not purport to find irreparable harm or the inadequacy of legal remedies.[31] Accordingly, we cannot agree with the District that the one room per child provision is un-

related to the requirement that no child wait more than ten days for placement elsewhere.

The District has been found to be in civil contempt. There are only two recognized defenses in civil contempt proceedings, substantial compliance and inability to do that which the court commanded. *D.D. v. M.T., supra,* 550 A.2d at 44 (citing *Maggio v. Zeitz,* 333 U.S. 56, 76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948); *Smith v. Smith,* 427 A.2d 928, 932 (D.C.1980)). The District has not offered either defense.

Accordingly, except with regard to the provisions for out of state placements, decentralization of secure facilities, and management controls of YSA, we affirm Memorandum Orders "A" and "B," and we decline to vacate Memorandum Order "E's" provision requiring transfers within a ten day period.

*Affirmed in part, reversed in part.*

---

**30.** The trial judge not only invoked the procedures in the Decree affording the parties the first opportunity to resolve differences among themselves, but also afforded the District additional time to resolve its differences with appellees before imposing his own resolution. Appellees passed up opportunities under which it could have sought to have held the District in contempt under the Decree. *See* Consent Decree ¶ II(G). Hence, the District's attempt to attack the trial judge's remedial order on the ground that he was required to use the Decree dispute-resolving procedures first, and that the Decree limited the circumstances under which contempt could be sought by appellees, must fail.

**31.** The trial judge held hearings on the potential harm to the class meant to benefit from the Decree before fashioning his conclusions about appropriate remedial orders. Those hearings, as well as other evidence in the record, including the Panel's report, see note 11, *supra,* and the dangers encountered by youth at the District's secure facilities which caused appellees to seek emergency relief from the court to reduce overcrowding at the Children's Center, see note 16, *supra,* leave no room for this court to find that the trial judge failed to make the necessary findings before issuing his remedial order.