**Fredericka HARRIS, as next friend and in behalf of her minor child, Lavon Harris, and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**Richard J. BELL, III, Superintendent, Training School For Boys, Boonville, Missouri, et al., Defendants.**

**No. 73 CV 115 W-4.**

United States District Court, W. D. Missouri, C. D.

Sept. 8, 1975.

Ann K. Fleming, Columbia, Mo., Wendy W. Schiller, Dudley P. Spiller, St. Louis, Mo., for plaintiffs.

Preston Dean, Asst. Atty. Gen., Jefferson City, Mo., for defendants.

## STIPULATIONS OF FACT

ELMO B. HUNTER, District Judge.

### INTRODUCTION

This action was filed in August, 1973, by the plaintiff, Fredericka Harris, pursuant to Rule 23(a) and Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of her minor son, Lavon Harris, and all others similarly situated in the State of Missouri. Its purpose was to challenge the lawfulness of certain practices and conditions at the State Board of Training Schools facility at Boonville, Missouri (hereinafter referred to as T.S.B.) as they affected the plaintiff class of juveniles. This court requested the parties to attempt to resolve their differences through negotiation, and such attempts were immediately begun. The negotiations were unavoidably delayed during the spring of 1974, because of a potential governmental reorganization which meant that in all probability many of the named defendants would not continue in positions of authority and responsibility in regard to the operation of the T.S.B. later than mid-summer, 1974, and that new defendants could not be identified until that time. The original defendants were unwilling to bind unknown successors by their own decisions. As is evident from this Court's order of September 5, 1974, substituting and dismissing parties, this change in authority and responsibility did in fact take place. Negotiations were then resumed, and have continued up until the present.

These stipulations of fact concern practices and conditions as they existed

at the time of the filing of this suit as well as present practices and conditions. The parties have stipulated to the accuracy of this material. The parties are further agreed that this material is for use only in the present litigation.

## A. PAST PRACTICES AND CONDITIONS

On the second and third floors of the Administration Building of the T.S.B. there are eighteen single-person cells, each 6′ 6″ wide and 9′ 6″ deep with a 9′ ceiling. It is the use of, and conditions in, these cells which are the subject of this litigation. At the time that this suit was filed, these cells were collectively called the "Day Nursery."

Four of these cells are on the third floor of the Administration Building and fourteen are on the second floor. Each of the third-floor cells was equipped with a combination sink-commode without toilet seat, a solid steel bunk, a mattress, sheets and blankets when needed. These four cells all front on a large common room and face a brick wall, two lights at the top of which provided a very small amount of illumination for inmates in the cells. A very small amount of light also enters the rear of each cell, through a high barred opening.

These four cells were very poorly ventilated, and often filthy, as was the common area which they faced. Three fans and a single small air-conditioning vent, which was not operating at the time the suit was filed, were totally inadequate to dispel the uncomfortable heat and the foul odors which permeated this part of the facility. The juveniles housed in these cells ate their meals lying on their stomachs on the cell floors, reaching out through the bars to get food placed on the floor just outside each cell door. The paper plates on which meals were served were too large to pass between the barred openings in the doors.

Juveniles in these four cells were left unattended except for the short periods when institution staff brought meals. No staff member was on continuous duty

on the third floor of this building, and a heavy door blocked these cells off from the remaining areas of the third floor. Showers were provided approximately once a week, and aside from this, juveniles on the third floor spent virtually all of their time in their cells. No regular programs of recreation, counselling or education existed for any of these juveniles.

Juveniles confined in the fourteen second-floor cells were not so isolated from staff, being at all times within calling distance. These fourteen cells also differ from those on the third floor in that a small space at the bottom of each allows food plates to be slipped into the cell. Twelve of these cells contain separate toilet bowls, without seats, and sinks. The remaining two cells had "oriental toilets," grated holes in the floor. All fourteen cells contained webbed-steel bunks, a mattress, sheets, and blankets when needed.

At the time this suit was filed, not a single cell on the second floor contained a working light. Small, barred vents in these cells are non-functional, providing neither heat nor fresh air. The cells are hot and stifling in summer because of ineffective ventilation. The only light which penetrated these cells came from windows across the corridor or from corridor ceiling lights, half of which were inoperable at the time this suit was filed. The mattresses were stained, torn, and generally filthy, and the cells, sinks and commodes were also deplorably unclean.

None of the juveniles in any of the cells was regularly and routinely afforded such necessities as toothpaste, toilet paper, soap, towels, washcloths or shampoo. Like the juveniles on the third floor, second-floor inmates were showered approximately once a week. All meals were eaten inside the cells. All spent virtually their entire days in the cells. No regular program of recreation, counselling or education existed for any of these juveniles. None attended, or was permitted to attend, any religious serv-

ices. Incoming and outgoing mail was censored sporadically. All incarcerated juveniles wore white, pajama-like garments.

Prior to the filing of this suit there existed no written regulations at the T.S.B. as to conduct which could result in maximum-security incarceration, nor was any child granted a hearing to determine whether his conduct merited such incarceration. All confinements were indefinite in nature. Careful records were kept, however, concerning the length of each child's stay as well as the reason for his initial confinement. An examination of these records reveals the following patterns and usages:

In the year 1971, there were eight hundred and forty-eight separate confinements of juveniles in the cells in the Administration Building at the T.S.B. Two hundred and ninety-eight of these confinements were longer in duration than ten days, the maximum single confinement being forty-nine days in duration. Among those confinements, and the offenses which gave rise thereto, were the following:

| E.H. | 43 days | fighting |
|------|---------|----------|
| W.Y. | 17 days | insubordination |
| A.A. | 21 days | escape |
| S.R. | 11 days | throwing articles |
| R.F. | 48 days | pending assault and robbery |
| L.M. | 14 days | destroying state property |
| L.H. | 28 days | escape |
| D.T. | 35 days | striking a supervisor |
| R.F. | 23 days | attempted auto theft |
| T.C. | 26 days | escape |
| C.R. | 21 days | attempted escape |
| D.M. | 20 days | fighting and threatening officers |
| V.C. | 14 days | threatening supervisor in vulgar language |
| R.T. | 31 days | assault on supervisor with handbrush |
| N.F. | 26 days | threatening supervisor |
| B.F. | 38 days | escape |
| A.D. | 14 days | refusing to work |
| R.W. | 10 days | sniffing paint thinner |
| T.S. | 21 days | attempted hitting with chair |
| E.H. | 16 days | defiant behavior |
| E.H. | 20 days | breaking hospital window |
| R.B. | 12 days | continual disturbance |

In the calendar year 1972, there were eight hundred and fifty-seven confinements in the cells. One hundred and thirty of these confinements were longer than ten days, the maximum single

confinement lasting one hundred and seventeen days. Among those confinements were the following:

| L.J. | 13 days | refusing to attend school and throwing feces |
|------|---------|----------|
| T.R. | 19 days | fighting and stealing |
| A.R. | 15 days | fighting |
| J.J. | 16 days | escape |
| S.R. | 21 days | escape and destroying things |
| D.D. | 13 days | breaking windows |
| L.J. | 11 days | refusing to work |
| B.P. | 27 days | escape |
| T.R. | 13 days | smoking in an off-limits area |
| A.P. | 12 days | refusing to work |
| L.M. | 10 days | rioting |
| T.R. | 15 days | various offenses |
| T.R. | 13 days | protection |
| L.J. | 11 days | disrespect to caseworker |
| B.S. | 24 days | insubordination |
| G.L. | 34 days | escape |
| H.B. | 34 days | escape |
| D.T. | 31 days | escape |
| L.R. | 61 days | creating a disturbance |

In the year of 1973 (Defendant Bell became Superintendent of the Training School in January of that year), the total number of confinements was six hundred and twenty-one. One hundred and four of those confinements were longer than ten days. Among those confinements were the following:

| L.B. | 20 days | escape |
|------|---------|----------|
| A.W. | 43 days | attempted escape |
| O.S. | 29 days | assault on supervisor |
| G.F. | 66 days | from Cole County Jail |
| A.R. | 27 days | from Cole County Jail |
| B.D. | 14 days | disturbance |
| A.T. | 50 days | assault |
| A.P. | 32 days | disturbance |
| R.P. | 26 days | disturbance |
| E.K. | 41 days | escape |
| M.A. | 33 days | new student hold reception |
| C.C. | 60 days | assault on staff |
| B.D. | 60 days | assault on staff |
| W.E. | 62 days | assault on student |
| M.E. | 13 days | returned parolee |
| C.G. | 73 days | returned parolee |
| F.H. | 16 days | disturbance |
| V.J. | 24 days | disturbance |
| P.J. | 14 days | pre-release hold for Carver |
| B.D. | 32 days | escape and civil action |
| B.P. | 19 days | disturbance |
| M.S. | 30 days | assault on staff |
| C.W. | 46 days | escape and assault on staff |
| R.W. | 23 days | sniffing glue and popping pills |

In the year 1974, the total number of confinements through July (seven months' total), was one hundred and three. Eleven of these confinements were longer than ten days in duration, the maximum single confinement lasting eighty days. Thirty-four of the confinements were of one day's duration.

In the year 1975, up until May 5, the total number of confinements was seventeen. One was of eight days' duration; eleven were for twenty-four hours or less.

In each of the years 1971, 1972, and 1973, juveniles committed to the custody of the State Board of Training Schools and confined at the T.S.B. were transferred from that facility to one or more of the following Missouri jails: Pettis County Jail, Cole County Jail, Boone County Jail, and Jackson County Jail. None of these jails has any program of treatment, counselling, recreation or education for juveniles. None of the juveniles transferred to these facilities was afforded any hearing, either administrative or judicial, prior to such a transfer.

In the year 1973, one or more juveniles committed to the custody of the State Board of Training Schools and confined at the T.S.B. were indefinitely confined in cells in the Administration Building pending hearings under Section 219.230, subd. 2 (RSMo 1973 Supp.), the statute governing hearings on transfers of juveniles to the Department of Corrections. However, this statute expired on January 1, 1975, and the defendants agree therefore that such indefinite confinements will no longer take place.

In each of the years 1971, 1972, 1973, and 1974, one or more juveniles committed to the custody of the State Board of Training Schools and confined at the T.S.B. were confined in cells in the Administration Building indefinitely, pending possible hearings under Secton 211.-071 (RSMo 1969), the statute governing hearings on prosecutions of juveniles under the general law.

## B. NAMED PLAINTIFF

The named plaintiff in this action, Lavon Harris, was admitted to the T.S.B. on October 4, 1972, and released on September 24, 1973, after an unsuccessful attempt by the deputy juvenile officer of Cooper County to certify him for trial as an adult. During the period of his commitment to the T.S.B., Lavon Harris spent one hundred and eighty-three days (five different confinements) in the T.S.B. cells. One of these confinements was one hundred and twenty days in duration. He spent sixteen days in the Pettis County Jail, and seven days in the Cole County Jail. Thus, during a total T.S.B. commitment of three hundred and fifty-five days, Lavon Harris spent two hunded and six of those days in cells, either at the T.S.B. or in county jails.

## C. PRESENT CONDITIONS

The defendants in this case have agreed to dismantle the doors of the four cells on the third floor of the Administration Building, and have not utilized these cells for many months.

The fourteen cells on the second floor have each been provided with lights, new mattresses and mattress covers. The two cells which contained "oriental toilets" have been provided with combination sink-commodes, without toilet seats. All cells have been cleaned and painted. Other basic equipment, such as the steel bunks, toilets and sinks, is the same, but juveniles confined in the cells are now afforded certain basic necessities: soap, towel, washcloth, toothbrush, toothpaste, toilet paper. Juveniles are no longer required to eat all meals in their cells. They are afforded hearings within twenty-four hours after the initial confinement in the cells to ascertain their guilt or innocence of the offense allegedly committed. These hearings are conducted by a three-person panel of staff members not involved in the alleged incident. Each juvenile is allowed to have the assistance of a person of his own choosing, and may confront and cross-examine witnesses who appear against him at the hearing. Each child who is found to have committed the alleged offense may be committed to a cell for a specified maximum period, not to exceed seven days. No child who has appeared before the hearing panel has been found to be innocent.

Juveniles confined to their cells are allowed one hour of recreation and exercise outside their cells, inside the Administration Building, each day. They are allowed daily showers, and are not required to wear clothing different from that worn by the general population of the T.S.B. The use of pajama-like garments has been discontinued.

Juveniles in the cells are not allowed to attend any religious services, although upon request they may see a minister from Boonville.

Students entering the Training School for Boys are now given written notice as to the behavior which may result in their being placed in the second floor cells. Such notice is given to each youth when he arrives at the T.S.B.

Incoming mail is opened throughout the T.S.B. when staff believes it contains contraband. This is done by staff outside the presence of the juvenile.

### CONSENT DECREE

The parties hereto are mutually desirous of disposing of the issues raised by this suit without litigation, and for this reason plaintiffs and defendants are willing to consent to the entry of the following judgment, the provisions of which, when fully implemented and complied with, shall govern the procedures and conditions relating to the care, treatment, and confinement of children who, for disciplinary purposes or any other lawful reason, are segregated from the general population of youths presently or in the future at the Training School for Boys in Boonville, Missouri (hereinafter referred to as T.S.B.).

The court being fully advised in the premises, and having conferred with the parties and their attorneys herein, having reviewed all aspects of this case to date, including the stipulations of fact jointly agreed upon and filed by the parties hereto, having fully considered the desirability of disposing of the matters herein by means of a consent judgment and knowing the same to be freely agreed to by the plaintiffs and defendants herein as is evidenced by the signatures of their counsel hereto, does hereby order, adjudge and decree that the following judgment be and the same is hereby entered as the judgment of this court in this matter.

1. Because it is recognized that the cells on the third floor of the Administration Building of the T.S.B. cannot be brought into compliance with constitutional requirements and standards without the expenditure of vast sums of money, the defendants agree never to use the cells on the third floor to confine juveniles who are committed to the T.S.B., and the defendants agree to dismantle the cell doors.

2. Each juvenile who is committed to the T.S.B. shall, upon his arrival, be given written notice as to which offenses may result in his being incarcerated in any of the fourteen cells on the second floor of the Administration Building.

3. When any juvenile is charged with an offense which may result in his incarceration in any of the fourteen cells on the second floor, he shall be afforded a hearing to ascertain his guilt or innocence. Such hearings shall be conducted as soon as possible, but no later than within twenty-four hours after his initial confinement. The hearings shall be conducted by an impartial three-person panel of staff members not involved in the alleged offense. Each juvenile shall have adequate time to prepare to defend the charges and shall be allowed to have the assistance of a person of his own choosing and may confront and cross-examine witnesses who appear against him at the hearing and may present witnesses in his own behalf.

4. Each juvenile who is found by the panel to have committed an alleged offense may be committed to one of the cells for a specified maximum period not to exceed seven days, with the single exception that juveniles who are confined in cells pursuant to the hearing herein described and whose offenses, in the view of the defendants, merit prosecution under the general law as provided

by Section 211.071 (RSMo 1969) may be confined without limitation. When juveniles are held for prosecution by State authorities in these cells, the plaintiffs' counsel herein shall be notified.

5. Each juvenile who is confined in a cell shall be visited on each school day by the basic education teacher in whose class he was enrolled at the time of his incarceration. This teacher shall provide the student with all materials necessary for keeping him current in his studies. Whenever practical the student shall be permitted to work with his teacher, or study, outside his cell.

6. Juveniles confined in the cells shall be afforded the opportunity to shower once each day.

7. The parents or guardian of any juvenile who is committed to a cell shall be promptly notified about the commitment.

8. Incoming mail may be physically inspected for contraband in the presence of the juvenile-addressee; other than such physical inspection, no tampering, delaying, opening, reading, copying or censoring of any mail shall be permitted. Attorney-client mail shall be neither opened nor inspected. There shall be no limitations as to how often or with whom a child may correspond unless a complaint is received from the person being corresponded with.

9. Juveniles who are confined in their cells shall be notified at the time of their incarceration that they may see a minister or priest on request.

10. Juveniles committed to the cells shall be provided a minimum period of one hour's recreation daily outside the cells, such recreation to include vigorous physical exercise.

11. Non-academic reading materials of a broad variety shall be regularly provided by the librarian to juveniles who are confined in such cells.

12. Juveniles confined in such cells shall be allowed to eat at least two of their daily meals outside their cells whenever practical.

13. Juveniles confined in the cells shall be allowed to wear normal, casual clothing appropriate to the season. No juvenile shall be compelled to wear pajamas during the day unless he is ill and confined to bed.

14. Each cell shall be adequately heated, cooled and ventilated according to the season.

15. Each cell shall be individually equipped with lighting fixtures adequate for reading purposes. All lights and light fixtures in the cells and the corridors leading thereto shall be immediately replaced or repaired when they cease to function properly.

16. At least one adult staff member of the T.S.B. shall be within calling distance at all times of the day or night whenever any child is confined in one of the cells at the T.S.B.

17. Each cell shall be thoroughly cleaned by T.S.B. staff whenever it is vacated. Special care shall be taken to clean, disinfect and deodorize the sink and toilet facilities.

18. Juveniles committed to the cells shall be provided with cleaning and other hygienic materials for maintaining their cells in a clean and odor-free manner. They shall be provided with mops, brooms, rags, disinfectants, deodorizers and all articles necessary to clean the cells, the sinks and toilets during the period of confinement.

19. Each cell shall be provided with a clean, disinfected mattress which shall be changed when it becomes soiled or worn. All mattresses shall be provided with clean mattress covers which can be laundered when soiled.

20. Each juvenile who is committed to a cell shall be provided with clean, fresh bedding appropriate to the season: sheets, pillowcases, pillows and blankets. Sheets and pillowcases shall be changed when soiled, and also shall be changed when a cell is vacated. Pillows and blankets shall be laundered or changed when they become soiled or worn.

21. Each child who is confined in a cell is to be regularly provided with

soap, towel, and washcloth toothbrush, toothpaste and toilet paper.

22. The defendants agree that plaintiffs' attorney, Wendy W. Schiller, shall be permitted free access to the T.S.B. and to the juveniles confined therein, for a period of two years dating from the entry of this decree. She shall be informed of the transfer of any juvenile of the T.S.B. to a county jail. Also, she shall be informed of the holding of any juvenile in the detention unit for trial as an adult if such incarceration will exceed seven days. In the event of her death, or her resignation from the National Juvenile Law Center, prior to the expiration of the two-year period, the attorney who is then Director of the National Juvenile Law Center shall chose another staff attorney who shall have such access to the T.S.B. and the juveniles confined therein.