**DISTRICT OF COLUMBIA, et al., Appellants,**

v.

**JERRY M., et al., Appellees.**

**No. 89–1371.**

District of Columbia Court of Appeals.

Argued June 26, 1990.

Decided Sept. 5, 1990.

---

---

James C. McKay, Jr., Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellants.

David A. Reiser, Public Defender Service, and Donna L. Wulkan, with whom Kim Taylor and James Klein, Public Defender Service, Washington, D.C., were on the brief, for appellees.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This case is before us on appeal from the trial court's award of $63,497.58 in attorney's fees to Donna Wulkan for her work between June 8, 1988 and June 29, 1989, in enforcing the District of Columbia's compliance with a consent decree in the matter of the complex and lengthy "Jerry M." litigation. *See District of Columbia v. Jerry M.*, 571 A.2d 178 (D.C.1990). We hold that Ms. Wulkan's services are fully compensable under 42 U.S.C. § 1988 (1982), but vacate the award in part and remand to the trial court for further findings as to the reasonableness of the fee award.

## I.

The trial judge entered judgment on the consent decree following a class action filed on behalf of detained and committed juveniles, challenging the conditions under which they are confined at secure facilities maintained by the District of Columbia. The suit "alleg[ed] the failure of the District of Columbia and those officials responsible for administering the juvenile facilities ... to provide appropriate care, rehabilitation, and treatment to them in violation of the Constitution and the District of Columbia Code." *Jerry M., supra,* 571

A.2d at 180. The suit was originally brought by Donna Wulkan, an attorney and the fee claimant here, as next friend on behalf of Jerry M., and by other named plaintiffs representative of the class. At that time, the class was represented by the Public Defender Service (PDS) and the National Prison Project of the American Civil Liberties Union.

Following judgment on the consent decree,[1] plaintiffs' counsel moved to add Wulkan as attorney for the plaintiff class. By order of the trial court in February 1988, Wulkan became one of the attorneys for the plaintiff class that were monitoring compliance with the decree. By the time Wulkan entered her appearance in the case, the monitor appointed to oversee the District's compliance with the decree had reported several violations. Wulkan then took part in a series of efforts to enforce the District's adherence to the decree.

On May 6, 1988, appellees filed a motion for emergency relief to reduce overcrowding. After attempts at mediation failed, the trial judge issued Memorandum Order "C" on October 15, 1988, directing the District to implement measures to remedy overcrowding and understaffing. *See Jerry M., supra,* 571 A.2d at 183 n. 16. In addition, appellees filed a motion for a temporary restraining order enjoining unhealthy environmental conditions, and another to prevent continuing violations of the educational provisions of the consent decree. The court granted the first motion and referred the matter of violation of the education provisions to the monitor in accordance with mandatory mediation provisions of the decree. The court gave the parties until September 30, 1988 to determine whether the dispute could be settled without court intervention, and directed the monitor to submit findings and recommendations by October 4 if it could be resolved. Although the monitor submitted findings and recommendations, the plaintiffs ad-

---

1. A detailed description of the specific provisions of the consent decree is set out in our previous opinion addressing the propriety of certain orders entered by the court arising from appellees' efforts to enforce the decree. Those facts will not be repeated here. *See Jerry M., supra,* 571 A.2d at 180–83.

vised him that the dispute could not be resolved through the mediation process.

In February 1988, after a critical report from an expert retained by the monitor to evaluate the state of medical care and recommend specific improvements, the District agreed to a Corrective Action Plan implementing the expert's recommendations by June 1988. In October 1988, the monitor reported that "implementation [of the plan to improve medical care] appears to be at an impasse. Improvement has been slow in some areas, nonexistent in others; in some areas, medical services have worsened."

In December of 1988, appellees filed a motion for an order directing appellants to show cause why appellants should not be held in civil contempt for not complying with the medical, educational, staffing, and inmate population requirements of the consent decree, and with Memorandum Order "C." After denying appellants' motion to alter or amend Memorandum Order "C", the trial judge, on March 10, 1989, held the District in civil contempt upon finding that it had violated population limit provisions of the decree and certain provisions of Memorandum Order "C."[2] He deferred action on the motion with respect to the medical care provisions until after an evidentiary hearing, held in July 1989, where testimony was taken from members of the District's medical staff and public health officials and from an expert hired by appellees. On September 28, 1989, the judge entered Memorandum Order "H" finding that the District's failure to implement certain professional medical standards was "contumacious conduct," but that other asserted failures of compliance with the decree did not support a finding of civil contempt.

With respect to the educational provisions, appellees' contempt motion alleged that the District had failed to comply with certain of the monitor's recommendations, while acknowledging that some of the short term recommendations had been sat-

isfied. The judge ordered the District to show cause why it should not be held in contempt and conducted a hearing on April 3, 1990. On April 13, the District submitted an affidavit from the Director of the Department of Human Services detailing specific actions the "Department is undertaking to ensure compliance with the Consent Decree's provisions governing education, outplacement and suicide prevention." On July 2, 1990, the judge issued Memorandum Order "I" which, among other things, found the District to be in compliance with the decree provision regarding special education but out of compliance with multiple other educational provisions of the decree.

Ms. Wulkan's name appeared on most of the motions to enforce compliance. Up to June 3, 1988, the District voluntarily paid her $11,618.00 in attorney's fees but stated for the record that it was doing so without admitting her entitlement to such fees. In May of 1989, Wulkan filed a motion for additional attorney's fees under the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, which authorizes an award of attorney's fees to a prevailing party who sought to enforce provisions of the Civil Rights Act, 42 U.S.C. § 1983. The District opposed the request but the judge, after finding that Wulkan had provided "valuable and competent legal services" to the plaintiff class, granted the request for fees in all but minor respects. The District appeals from that order.

## II.

■ Generally, parties to a civil action must bear their own attorney's fees absent a contrary contractual provision or "specific and explicit [statutory] provisions for the allowance of attorney's fees." *Schlank v. Williams*, 572 A.2d 101, 108 (D.C.1990), *quoting Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 260, 95 S.Ct. 1612, 1623, 44 L.Ed.2d 141 (1975). As pointed out, Wulkan sought fees under the

**2.** This court subsequently affirmed the contempt citation but vacated certain aspects of other orders requiring the District to take ac-

tions beyond the scope of the consent decree. *Jerry M., supra,* 571 A.2d at 192.

Civil Rights Attorney's Fees Award Act, which provides in part:

> In any action or proceeding to enforce a provision of section [ ] ... 1983 ... of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988.

### A. Availability of Fees for Enforcement of a Consent Decree

 The District contends that § 1988 does not authorize a fee award in this case because, in enforcing the provisions of the consent decree through various motions, Wulkan did not seek to enforce § 1983 claims alleging deprivation of federal or constitutional rights, but rather sought to vindicate rights deriving solely from District of Columbia law. The District asks the court to focus on the "alleged violations of the consent decree for which [Wulkan] claims fees" and the absence in those allegations of any claimed infirmity under the United States Constitution or federal law.

It is true that Wulkan's May 6, 1988 Motion for Emergency Relief challenging overcrowding and other conditions at the Children's Center was premised on alleged violations of the consent decree and various provisions of the D.C.Code and Superior Court Juvenile Division rules. Similarly, later motions seeking to enforce compliance with provisions of the consent decree concerning educational services and medical care did not explicitly allege deprivations of constitutional or federal rights.[3] Nevertheless, we do not agree that § 1988 authorizes fees only to the extent that alleged violations of the consent decree themselves constitute deprivations of constitutional or federal rights.

 A plaintiff is a "prevailing party" within the meaning of § 1988 if he or she succeeds in obtaining relief by way of a settlement agreement or consent decree; "[n]othing in the language of § 1988 conditions [the court's] power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated." *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980). To be deemed a "prevailing party," it is necessary only that the plaintiff "succeed on any *significant* issue in litigation which achieves *some of the benefit* the parties sought in bringing the suit." *Allen v. District of Columbia*, 503 A.2d 1233, 1236 (D.C.1986), *quoting Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), *in turn quoting Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978) (emphasis in *Allen*). *See also Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 1491–93, 103 L.Ed.2d 866 (1989) (endorsing *Hensley/Nadeau* formulation).

In *Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), the Supreme Court held that a statutory fee provision analogous to § 1988 authorized fees for efforts to enforce compliance with a consent decree in an administrative proceeding. The Court reasoned that "[p]rotection of the full scope of relief afforded by the consent decree was ... crucial to safeguard the interests asserted [by the plaintiff]," and "[i]n a case of this kind, measures necessary to enforce the remedy ordered by the District Court cannot be divorced from the matters upon which [the plaintiff] prevailed in securing the consent decree." *Id.* at 558–59, 106 S.Ct. at 3095. The Court observed that "several courts have held that, in the context of [§ 1988], post-judgment monitoring of a consent de-

---

**3.** This statement is subject to one qualification. Addressing the class plaintiffs' claims that the District had failed to provide screening, classification and special education to handicapped children in its charge as required by the Education of the Handicapped Act, 20 U.S.C. §§ 1400–1485 (1988), the consent decree required the District, among other measures, "to

comply fully with the requirements of the [EHA] and its implementing regulations by September 1, 1987." Notwithstanding the incorporation of the EHA into the decree, Wulkan's contempt motions relied on the District's noncompliance with the handicapped education provisions of the decree, rather than violations of federal law.

cree is a compensable activity for which counsel is entitled to a reasonable fee." *Id.* at 559, 106 S.Ct. at 3095, *citing Garrity v. Sununu,* 752 F.2d 727, 738–39 (1st Cir. 1984); *Bond v. Stanton,* 630 F.2d 1231, 1233 (7th Cir.1980); *Miller v. Carson,* 628 F.2d 346, 348 (5th Cir.1980); *Northcross v. Board of Education,* 611 F.2d 624, 637 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980).

These and other decisions recognize that, oftentimes, a consent decree "represent[s] only a beginning. Without determined, competent and dedicated representation, the provisions of [the c]onsent [d]ecree might have little practical significance for the class members." *Duran v. Carruthers,* 885 F.2d 1492, 1496 (10th Cir.1989), *quoting Brewster v. Dukakis,* 544 F.Supp. 1069, 1072 (D.Mass.1982), *modified on other grounds,* 786 F.2d 16 (1st Cir.1986). Whenever "[p]erseverance and a watchful eye [have] led to the filing of a motion for contempt," *McDonald v. Armontrout,* 860 F.2d 1456, 1461 (8th Cir.1988), in turn assuring "protection of the *full scope* of the relief afforded by the consent decree ... crucial to safeguard the interests [of the plaintiff class]," *Delaware Valley, supra,* 478 U.S. at 558, 106 S.Ct. at 3095 (emphasis added), those activities are compensable under § 1988.

Here, the class plaintiffs sought a broad range of relief on a variety of claims, some founded on constitutional and federal law and others on District of Columbia law. They achieved the benefit sought by the *entire action* by way of a judgment entered on a consent decree rather than on the merits of the individual claims. That the measures required by the decree may have exceeded minimum constitutional standards does not mean they bore no relation to the constitutional claims asserted under § 1983 in the complaint. As alleged in the various motions to compel compliance, the District's widespread disregard of its obligations under the decree threatened the relief attained in the decree addressing conditions plaintiffs had alleged violated their constitutional rights. "Efforts to monitor compliance with a consent judgment 'cannot be severed from the matters upon which the plaintiff prevailed' by obtaining the consent judgment." *Turner v. Orr,* 785 F.2d 1498, 1503 (11th Cir.1986), *quoting Adams v. Mathis,* 752 F.2d 553, 554 (11th Cir.1985) (per curiam). Whether or not violation of the decree's provisions rose to the level of a denial of constitutional or federal rights, the decree as a whole served to provide relief for the full array of plaintiffs' claims.

■ Not only were the § 1983 claims joined with others based on District of Columbia law in the complaint, but the factual allegations underlying both classes of claims were, for the most part, identical. Thus, there is nothing to suggest that the § 1983 claims were resolved against the plaintiffs or otherwise vanished at the moment the court approved the settlement. Even if the provisions of the decree Wulkan sought to enforce represented success only on claims founded on District of Columbia law, this would not defeat plaintiffs' right to fees under § 1988. Successful state-based claims may also support a fee award provided they are joined with unresolved substantial constitutional or federal claims which arise from a common nucleus of operative facts with the state-based claims. *Allen v. District of Columbia, supra,* 503 A.2d at 1237, *citing Maher v. Gagne, supra,* 448 U.S. at 132, 100 S.Ct. at 2576. Plaintiffs' allegations regarding physical conditions and educational and medical services gave rise to both constitutional and non-constitutional claims. Thus, even assuming the settlement secured relief for plaintiffs on the local statutory claims only, fees would still be authorized under § 1988.

■ However, although § 1988 does not condition a fee award on an adjudication of a constitutional claim in the plaintiff's favor, merely to invoke the federal constitution in a complaint does not entitle a prevailing party to attorney's fees when the claim remains unaddressed; "[i]f a litigant could obtain fees simply by an incantation of § 1983, fees would become available in almost every case." *Smith v. Robinson,* 468 U.S. 992, 1003, 1007, 104 S.Ct. 3457,

3463–64, 3465–66, 82 L.Ed.2d 746 (1984). As we now develop, the undecided constitutional claims must be "substantial" in the sense that they would support federal subject-matter jurisdiction under 28 U.S.C. § 1331 (1988) if brought in federal court, *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); and the ultimate relief attained must be reasonably related to those claims. *Smith, supra,* 468 U.S. at 1007, 104 S.Ct. at 3465–66.

### B. Constitutional "Substantiality"

The first of these two requirements is "an extremely lenient one," *Grano v. Barry,* 251 U.S.App.D.C. 289, 296, 783 F.2d 1104, 1111 (1986), deriving from the test for federal subject-matter jurisdiction over constitutional claims set forth in *Hagans v. Lavine, supra:*

> "Constitutional insubstantiality" for this purpose has been equated with such concepts as "essentially fictitious," ... "wholly insubstantial," ... "obviously frivolous," ... and "obviously without merit." ... A claim is insubstantial only if " 'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.' "

415 U.S. at 537–38, 94 S.Ct. at 1379; *quoting Ex Parte Poresky,* 290 U.S. 30, 32, 54 S.Ct. 3, 4–5, 78 L.Ed. 152 (1933) (citations omitted).

In *Maher v. Gagne, supra,* the Supreme Court acknowledged the *Hagans* substantiality formulation in holding attorney's fees under § 1988 authorized when the plaintiff alleged constitutional claims substantial enough to support subject-matter jurisdiction, despite the fact that those claims were not adjudicated and ended in a settlement. 448 U.S. at 128 n. 10, 131–32, 100 S.Ct. at 2574 n. 10, 2575–76. Noting the prominence of the *Hagans* test in the

legislative history accompanying § 1988, the Court observed that "Congress intended fees to be awarded where a pendent constitutional claim is involved, even if the ... claim on which the plaintiff prevailed is one for which fees cannot be awarded under the Act." *Id.* at 132 n. 15, 100 S.Ct. at 2576 n. 15, citing H.R.Rep. No. 94–1558 (1976).[4]

Despite the Court's apparent acceptance of the *Hagans* test in *Maher,* the District argues that this court is free to adopt a more rigorous definition of substantiality because the meaning of that concept was not at issue in *Maher.* As pointed out previously, however, *Maher* concluded that "[n]othing in the language of § 1988 conditions [the court's] power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated." *Id.* at 129, 100 S.Ct. at 2575. The District itself concedes that "*Maher* ... reflects a determination that the constitutional claim need not be found meritorious." But to accept the District's proposed standard of a showing of "some real substance" to constitutional claims beyond what *Hagans'* "not clearly foreclosed by prior decisions" formulation demands, would require in practice the same inquiry into the merits that *Maher* understood Congress not to have intended at the attorney's fee stage. As *Maher* recognized, Congress provided for attorney's fees without a decision on the merits of a constitutional claim if the claim was not frivolous and the plaintiff prevailed on a factually-related nonconstitutional claim; it did so to avoid penalizing a plaintiff when the trial court has followed the prudential course of deciding a case on non-constitutional grounds. *Id.* at 132 n. 15, 100 S.Ct. at 2576 n. 15, quoting H.R.Rep. No. 94–1558, *supra,* at 4 n. 7. There is surely no reason to adopt a more rigorous standard where the defendant has avoided trial of both the constitutional and non-constitutional claims by agreeing to a settlement.[5]

---

**4.** In text the Court stated: "Congress was acting within its enforcement power in allowing the award of fees in a case ... in which both a statutory and a substantial constitutional claim are settled favorably to the plaintiff without

adjudication." 448 U.S. at 132, 100 S.Ct. at 2576.

**5.** The District cites decisions from various states which it says have employed more exacting substantiality tests than *Hagans.* Some appear to

What the District desires, in essence, is a requirement of proof of likely success on the merits, a standard akin to that for obtaining a preliminary injunction. We agree with the United States Court of Appeals for the District of Columbia Circuit, however, that the *Maher/Hagans* standard

> requires courts to dismiss fee claims based on wholly frivolous lawsuits, but simultaneously constrains them from holding a full trial, *or from making ad hoc predictions about the plaintiff's chance for success, on the merits.* The court may only consider whether claimant's action is frivolous, unreasonable, or groundless.

*Miller v. Staats,* 227 U.S.App.D.C. 299, 304 n. 31, 706 F.2d 336, 341 n. 31 (1983) (internal quotation marks and citations omitted; emphasis added). In *Miller* the court remanded the fee claim because the trial court had denied fees on the ground that claimants had not made out "any sufficient threshold showing of real discrimination" against certain government workers, a test the appellate court concluded "appears to hold fee claimants to a higher standard than the law requires." *Id.* at 305, 706 F.2d at 342. We agree with that conclusion.

Accordingly, we must examine whether the constitutional claims of the plaintiff class were substantial under the *Maher/Hagans* standard. We hold that the complaint satisfies that test. Count I alleged that the totality of the conditions at the District's juvenile facilities violated the right of confined juveniles to be free of harm, unnecessary restraint, and cruel and unusual punishment secured by the Fifth

and Eighth Amendments; Count II alleged that the failure to provide adequate educational services violated the Fifth and Eighth Amendments; Count III claimed that the failure to provide adequate medical services violated the right of confined children to rehabilitative treatment, secured by the Fifth Amendment, and their Fifth and Eighth Amendment rights to be kept free from harm; Count IV alleged that the failure to provide safe and humane living conditions violated the Fifth and Eighth Amendments; Count V alleged that the lack of adequate vocational training, counseling and social services, and parental visitation violated the Fifth Amendment right to rehabilitative treatment; Count VI claimed that the District's failure to provide adequate facilities for consultation with attorneys violated the Fifth Amendment; and Count VII alleged that the climate of violence within the institutions caused by the District's neglect violated the Fifth and Eighth Amendments.

The fact that each count except Count VI also alleged violation of rights created under the District of Columbia Code does not reveal the constitutional claims as spurious or without substance. In the aggregate, the allegations constituted a claim that the District was confining juveniles for a purpose and in a manner inconsistent with fundamental due process. A recurrent theme in the complaint is the asserted deprivation of confined juveniles' Fifth Amendment right to rehabilitative treatment. We need not decide whether such a right exists or its scope; it is enough to point out that several federal courts have recognized the right[6] and that the District cites us to

---

be basically in accord with *Hagans.* The District relies chiefly on *Jackson v. Town of Searsport,* 456 A.2d 852 (Me.), *cert. denied,* 464 U.S. 825, 104 S.Ct. 95, 78 L.Ed.2d 101 (1983), in which the court criticized application of the *Hagans* standard to the "retrospective inquiry of whether a party has prevailed for purposes of section 1988," *id.* at 855 n. 13, and concluded: "If a federal claim under the civil rights laws has no merit, it cannot serve as the predicate for the imposition of attorney's fees simply because it is appended to a valid state claim." *Id.* at 856. To the extent *Jackson* (and other cases cited by the District) hold that a constitutional claim actually adjudged meritless cannot support an

award of fees on a successful pendent claim for which no fees are authorized, they are consistent with our holding in *Allen, supra,* that "[i]f it is determined that no constitutional right is violated, the predicate for the award vanishes." 503 A.2d at 1236. But, for the reasons stated in the text, this rule does not justify reaching the merits of undecided constitutional issues at the terminus of a case resolved by a consent decree simply to determine a prevailing party's eligibility for attorney's fees.

**6.** *E.g., Nelson v. Heyne,* 491 F.2d 352, 358–60 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Morgan v. Sproat,*

nothing in Supreme Court decisions expressly or impliedly rejecting it. It has been argued that, to meet constitutional demands, "the nature ... of confinement must bear a reasonable relation to the purpose of the intervention," and that "[m]ere custodial confinement without treatment bears no relationship to the rehabilitative purpose of the juvenile system." R. HOROWITZ & H. DAVIDSON, LEGAL RIGHTS OF CHILDREN, § 11.37, at 506 (1984). The argument is not frivolous. *See Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972).[7] In the District of Columbia, the dual ends of juvenile justice—treatment and rehabilitation, as opposed to punishment—inform the statutory scheme governing juveniles. *See In re L.J.*, 546 A.2d 429, 437 (D.C.1988) ("the District of Columbia is firmly committed to a rehabilitative approach to juvenile justice"). What "makes a juvenile proceeding fundamentally different from an adult criminal trial," *Schall v. Martin*, 467 U.S. 253, 263, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984), is "the strong government interest in determining the treatment required to rehabilitate youthful offenders." *In re L.M.*, 432 A.2d 692, 694 (D.C.1981). *See also In re C.W.M.*, 407 A.2d 617, 622 (D.C.1979); *District of Columbia v. P.L.M.*, 325 A.2d 600, 604 (D.C.1974).

Relying on these principles, plaintiffs here asserted that the conditions of confinement of juveniles in the District's institutions—alleged to include no efforts at rehabilitation through education, counseling, vocational training and other services, and to place children at unnecessary risk of physical and emotional harm—amounted to punishment, a constitutionally invalid goal of confinement of persons denied procedural rights of adult defendants. Whatever the ultimate merits of that claim, to satisfy *Hagans* it is enough that it is not foreclosed by any apparent binding authority.[8] Other claims of the plaintiffs relating to the failure to provide medical care, failure to prevent physical abuse, and use of physical restraints allege violations of "constitutionally protected interests in conditions of reasonable care and safety [and] reasonably nonrestrictive confinement conditions" recognized by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) (commitment of mentally retarded). In the context of juvenile confinement, these claims too are substantial within the meaning of *Hagans*.

### C. Causal Relation

As stated earlier, unadjudicated constitutional claims must satisfy an additional requirement to permit an award of attorney's fees under § 1988: the relief obtained must be related to those claims. *Smith v. Robinson, supra*, 468 U.S. at 1006, 104 S.Ct. at 3465. The United States Court of Appeals for the District of Columbia Circuit has explained this relation by saying that § 1983 claims must have "served as catalysts in securing the result" achieved by

---

432 F.Supp. 1130 (S.D.Miss.1977); *Gary W. v. Louisiana*, 437 F.Supp. 1209 (E.D.La.1976); *Harris v. Bell*, 402 F.Supp. 469 (W.D.Mo.1975); *Morales v. Turman*, 364 F.Supp. 166 (E.D.Tex. 1973), *rev'd on other grounds*, 535 F.2d 864 (5th Cir.), *rev'd and remanded*, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368; *on remand*, 562 F.2d 993 (5th Cir.1977); *Inmates of Boy's Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I.1972); *Martarella v. Kelly*, 349 F.Supp. 575 (S.D.N.Y.1972). *But see, Santana v. Collazo*, 714 F.2d 1172, 1176-77 (1st Cir.1983).

7. As one court has stated, citing *Jackson v. Indiana*, "[S]ince the State has defined its interest in taking custody of delinquent children as rehabilitation, due process requires that the nature of the child's custody bear a relation to that rehabilitation." *State ex rel. R.S. v. Trent*, 169 W.Va. 493, 289 S.E.2d 166, 175 (1982).

8. Aside from the claims referring to this Fifth Amendment theory, the complaint alleged that certain practices, including overcrowding, violate the Eighth Amendment proscription against cruel and unusual punishment. While the District argues that such practices as "double-celling" have conclusively been established not to constitute deprivation of the Eighth Amendment rights of adult prisoners, *see Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Inmates of Occoquan v. Barry*, 269 U.S.App.D.C. 210, 218, 844 F.2d 828, 836 (1988), these authorities do not resolve the issue of whether such practices, *as applied to juveniles*, can constitutionally be reconciled with a system that does not purport to punish but rather to treat and rehabilitate.

the class plaintiffs. *Grano v. Barry, supra,* 251 U.S.App.D.C. at 295, 783 F.2d at 1110.

> In making this causal inquiry ... courts [should] consider the chronological sequence of events and draw conclusions from the facts at hand.... From this sequence of events, the court must determine whether it is more likely than not that [the] fee claimant['s] participation contributed to defendant's action [in settling]—so that the relief granted cannot be ascribed to other influences.

*Miller v. Staats, supra,* 227 U.S.App.D.C. at 304 n. 32, 706 F.2d at 341 n. 32 (internal quotation marks and citations omitted). These statements fairly explicate the causation standard. *See also S.D. v. Faulkner,* 705 F.Supp. 1361, 1364–65 (S.D.Ind. 1989).

The District's consent to implement the provisions of the settlement can be traced in substantial measure to the claims alleged for which fees could be awarded under § 1988. The decree states that it was being submitted for the court's approval to "resolve the issues in C.A. 1519–85," the class action. Moreover, there is substantial identity between the requested relief from conditions generating those claims and the provisions of the decree. In its prayer for injunctive relief, the complaint sought to compel the District: to provide appropriate, humane, and safe living conditions in residential units; to provide adequate educational services (for both the general population and educationally handicapped children), including compliance with the Education of the Handicapped Act; to provide adequate medical, counseling and mental health services and vocational training; to provide staff training and supervision of residents and take other steps to prevent counselor assaults on residents and resident assaults on other residents in the detention facilities; to promulgate and ensure staff compliance with proper disciplinary procedures; to provide adequate recreational services; and to adopt procedures necessary to ensure detained and committed children adequate opportunities for family visits and consultation with legal counsel. The decree memorializes the District's agreement to address many of these conditions by "requiring housing [population] limitations, minimum standards for staffing and training, improvements in diagnostic services, treatment planning through individual service plans (ISP) and Team Leaders, as well as education, recreational, and mental health services and medical services," *Jerry M., supra,* 571 A.2d at 181 & nn. 8, 9, and family visitation and attorney consultation procedures.

In *Smith v. Robinson, supra,* the Supreme Court reasoned that where fee claimants "present[ ] distinctly different claims for different relief, based on different facts and legal theories, and have prevailed only on a nonfee claim, they are not entitled to a fee award simply because the other claim was a constitutional claim that could be asserted through § 1983." 468 U.S. at 1015, 104 S.Ct. at 3470. Here, in sharp contrast, the plaintiffs sought the same relief under both their fee and nonfee-generating claims—claims predicated on exactly the same facts. Because the issues were resolved by a consent decree giving the class substantially the relief requested, it cannot be said that plaintiffs "prevailed only on a nonfee claim." In agreeing to be bound by the decree, the District spared itself the "time, expense and inevitable risk of litiga[ting]" both the nonfee claims and the § 1983 claims as well. *Jerry M., supra,* 571 A.2d at 185, *quoting Brown v. Nebb,* 644 F.2d 551, 557 (6th Cir.1981). Plaintiffs thus satisfied the causation requirement as well.

### III.

The District further contends that, even if § 1988 permits attorney's fees for Ms. Wulkan's efforts to enforce the consent decree, the fee award must be vacated and remanded because the trial judge abused his discretion in awarding fees that compensated activities by Wulkan which duplicated the services of other attorneys staffing the case. The District argues, at a minimum, that the judge failed adequately to explain the reasons supporting his virtually complete grant of Wulkan's request, particularly in light of the District's de-

tailed opposition filed below. We find merit in the latter point, and thus conclude that a remand is necessary for a fuller statement of the judge's reasoning specifically addressing the District's claim that at least some of Wulkan's services were unnecessary and duplicated those of PDS attorneys. Our disposition, however, is without prejudice to an immediate application by Wulkan in the Superior Court for an order directing partial payment of the fee requested. We leave the determination of any such amount to the judge, noting only our opinion that a partial interim award appears justified.

### A.

 After entering her appearance as an attorney in February 1988, Wulkan submitted two invoices for fees to the District which it disputed. A settlement was reached with the court's approval whereby the District, without conceding Wulkan was entitled to fees for monitoring compliance with the decree, agreed to pay her a total of $11,618.00 for work performed between February 8 and June 3, 1988. On May 1, 1989, Wulkan filed a motion for attorney's fees and costs seeking payment for services rendered from June 3, 1988 forward. In opposing the motion, the District argued that (1) Wulkan was not entitled to claim fees because only the ACLU had reserved the right to fees in the consent decree;[9] (2) fees were available for enforcement of the decree only to the extent the District's alleged noncompliance violated federal or constitutional rights; (3) the fee sought was unreasonable because it duplicated services performed by PDS attorneys and requested fees for unnecessary and excessive work, and (4) the fee application was insufficiently detailed to permit assessment of the reasonableness of the fees claimed.

The judge entered an order granting the fee motion almost entirely. He correctly rejected the District's arguments (1) and (2)

above, and as to the argument that Wulkan's documentation was insufficiently detailed, found the detail "sufficient to permit a reasonable person to make an informed judgment regarding the reasons for the fees charged." As to the claim of duplicative and excessive work, the judge stated:

Some of the defendants' concerns expressed about Ms. Wulkan's billing practices as an attorney member of the plaintiff's team of lawyers fail[ ] to recognize the complex nature of the plaintiffs' task. Defendants' failure to date to comply with substantial portions of the Consent Decree underscores one dimension of the difficulty of the undertaking. The plaintiffs have been scrupulous in attempting to ensure that the Youth Services Administration discharges its responsibilities to the citizens of the District of Columbia and the young people entrusted to its care. Ms. Wulkan's participation as a plaintiff's team member has thus far proven important, constructive and productive.

Defendants are correct when they argue that some of Ms. Wulkan's time for which she is now claiming fees, is time spent in consultation with other members of plaintiffs' team of attorneys. The Court, having reviewed carefully Ms. Wulkan's fee application finds that the time spent conferring with co-counsel is well within reasonable limits. The Court finds defendants' concern to be a valid one, however, and cautions Ms. Wulkan to continue to exercise the same judgment evident in the application under consideration.

### B.

Determining the amount of a "reasonable" attorney's fee under § 1988 is a matter within the trial judge's discretion. *Hensley v. Eckerhart, supra,* 461 U.S. at 437, 103 S.Ct. at 1941; *Henderson v. District of Columbia,* 493 A.2d 982, 999 (D.C.

---

9. Relying on this provision, the District asserted that the parties had negotiated a waiver of fees as to the ACLU's successor, Ms. Wulkan. The trial judge rejected this *exclusio unius* argument, and we agree that the consent decree reflects no

waiver of Wulkan's right to claim fees, or exclusive reservation of the ACLU's right to do so, but is simply silent on the issue of fee claims of other attorneys of the class.

1985). The deference due that discretion is probably at its zenith when, as here, the judge has been absorbed in (if not consumed by) the litigation in question for years. But, although the appellate court must defer to the judge's "superior understanding" of the matters for which fees are sought, *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941, the judge does not enjoy unqualified discretion in fixing the fee amount. The legislative history and case law associated with § 1988 set forth boundaries that—as in the case of many exercises of discretion—limit "the range of permissible alternatives" and "enumerat[e] the factors the court may or should consider." *Johnson v. United States*, 398 A.2d 354, 365 (D.C.1979). In *Hensley* and *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Supreme Court fashioned a calculus which, if carefully applied, leads to a presumptively "reasonable" fee under § 1988. This court summarized and applied those standards in *Henderson v. District of Columbia*, *supra*.

The initial burden of showing that fees claimed are reasonable falls upon the fee claimant. *Blum, supra*, 465 U.S. at 897, 104 S.Ct. at 1548. After determining whether the fee claimant is a prevailing party, the judge should compute the number of hours reasonably expended on the litigation, excluding any claimed hours that are excessive, redundant, or unnecessary. *Henderson, supra*, 493 A.2d at 999, *citing Hensley, supra*, 461 U.S. at 434, 103 S.Ct. at 1939–40. As the Court recognized in *Hensley*, "cases may be overstaffed," 461

U.S. at 434, 103 S.Ct. at 1939–40, and thus "[c]ompiling raw totals of hours spent … does not complete the inquiry. It does not follow that the amount of time *actually* expended is the amount of time *reasonably* expended." *Copeland v. Marshall*, 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891–92 (1980) (en banc) (emphasis in original). *Accord, District of Columbia v. Hunt*, 525 A.2d 1015, 1016 (D.C.1987) (per curiam). Next, the judge must decide what constitutes a reasonable hourly rate for the services rendered, as measured by prevailing market rates in the relevant community for attorneys of similar experience and skill. *Henderson, supra*, 493 A.2d at 999. Lastly, multiplying these two figures yields a "lodestar" amount, *id.*, which is "presumed to be the reasonable fee contemplated by § 1988." *Blum, supra*, 465 U.S. at 897, 104 S.Ct. at 1548.[10]

*Hensley* and other authorities teach that a vital step in calculating the lodestar—indeed, the first step—is the exclusion of hours that are redundant or unnecessary. In its opposition below, the District raised specific questions concerning unnecessary duplication of effort by Wulkan. It noted that PDS had staffed the case at the enforcement stage with no fewer than four attorneys, that Wulkan attended court hearings "where three, and sometimes four other attorneys for plaintiffs [were] also present," and that on these occasions lead counsel "appear[ed] usually to be [a PDS attorney]." It cited seven instances of hearings for which Wulkan claimed fees where she allegedly played at most a secondary role.[11] In their brief, appellees assert that "Ms. Wulkan assumed *primary*

---

**10.** Because "there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high," *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548, after fixing the lodestar the court "must next turn its attention to upward or downward adjustments thereto." *Henderson, supra*, 493 A.2d at 999. At this point, the trial court may consider a multiplicity of factors, including the twelve considerations articulated in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir.1974). The judge must recognize, however, that at least some of those factors may be subsumed in the lodestar. *Id.* *See, e.g., Blum*, 465 U.S. at 898–99, 104 S.Ct. at

1548–49 (novelty and complexity of issues reflected in the number of hours reasonably expended; quality of representation generally reflected in a reasonable hourly rate). Wulkan has made no claim for enhancement of the lodestar amount.

**11.** The District also alleged that Wulkan attended inspection tours of District juvenile facilities by experts in the company of one or more PDS attorneys. Citing three such instances, it argued that Wulkan could have obtained at least a portion of the information she needed from the PDS staff rather than attending these tours herself.

*responsibility* for drafting pleadings, conducting discovery, and representing the plaintiff class in connection with issues relating to medical care and education" (emphasis added); from a similar understanding below the District argued that her role was subordinate in regard to other issues of overcrowding and understaffing. In its opposition, the District summarized several pages of billings related to her work on these issues.

At oral argument Wulkan argued strongly that her services and fee claims cannot validly be parsed according to the primary and secondary roles she assumed since the compliance issues were all interrelated and the judge impliedly found her services important to each. *Hensley*, however, requires the trial judge to deal explicitly with claims of duplication and redundancy,[12] and we are not persuaded on this record that the judge's obligation was satisfied by findings merely that, "having reviewed carefully Ms. Wulkan's fee application[,] ... the time spent conferring with co-counsel is well within reasonable limits," and given the "complexity of the plaintiffs' task," "Ms. Wulkan's participation as a team member has thus far proven important, constructive and productive." *See Johnson v. Georgia Highway Express, supra* note 10, 488 F.2d at 717 ("If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized"); *Copeland v. Marshall, supra,* 205 U.S. App.D.C. at 401, 641 F.2d at 891. Review of fee awards under § 1988 "requires a record that elucidates the factors that contributed to the fee decision and upon which it was based," *Evans v. Sheraton Park Hotel,* 164 U.S.App.D.C. 86, 97, 503 F.2d 177, 188 (1974); *see also Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir. 1984) (conclusory statements about reasonableness insufficient to withstand appellate review). On remand, the trial judge should

address the specific issues of duplication raised by the District. We imply no view on the propriety of the fee amount Ms. Wulkan sought or the court awarded; our concern is with the process by which the fees were computed. Consequently, the case is remanded for further findings as to the reasonableness of the fees requested; in all other respects the order appealed from is affirmed.

*So ordered.*

---

12. When Wulkan originally was permitted to enter her appearance as counsel, the judge made no finding whether her services were needed and could not be provided by counsel already in the case, primarily the PDS attorneys. The judge cannot be faulted in this regard since the District consented to Wulkan's entry and did not request any finding of need for her services. We note that absent such a finding, however, the risk of duplication of services in a case such as this is substantial.